UNITED STATES of America,
Plaintiff–Appellee,

v.

$109,179 IN UNITED STATES
CURRENCY, Defendant.

Leonard C. Maggio, Claimant–
Appellant.

No. 99–55040.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 7, 2000.

Filed Oct. 2, 2000.

Roger S. Hanson, Santa Ana, California, for the claimant-appellant.

Paul Watford and Eliot F. Krieger, Assistant United States Attorneys, Los Angeles, California, for the plaintiff-appellee.

Before: KOZINSKI, T.G. NELSON and WARDLAW, Circuit Judges.

T.G. NELSON, Circuit Judge:

Leonard Maggio appeals the district court's judgment of forfeiture against defendant of $109,179 in U.S. currency. Maggio challenges, on Fourth Amendment grounds, the actions of police officers which ultimately led to the discovery of the currency. We have jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

## I.

On July 5, 1984, after an individual named Robert Kalatschan was advised by motel staff that he had to vacate Room 320,[1] two hotel maids cleaning Room 320 discovered a large plastic bag containing a white powdery substance, as well as blood splatters on the walls and furniture. The maids turned the bag over to Ms. Nygren, the housekeeping supervisor, and resumed cleaning the room. Ms. Nygren gave the bag to the hotel manager, who, suspecting that the bag contained narcotics, called the police. Meanwhile, two men arrived at Room 320, demanded the plastic bag from the two maids, searched through the trash, and offered the maids money in return for the bag. One of the men, later identified as Kalatschan, was subsequently seen by one of the maids entering Room 323 with clean towels and a key. The location of the second man, described as a white male with dark hair, was unknown.

When police arrived at the hotel, an officer estimated the contents of the plastic bag to weigh one pound and conducted a field analysis which indicated that the substance was cocaine. Officer Jones, the supervising narcotics investigator, arrived at the hotel and was briefed on the foregoing facts. Jones and two other narcotics officers went to the door of Room 323, where they found Kalatschan. Kalatschan told police that Room 323 was rented to a "Steve Keller." The officers determined Kalatschan to be under the influence of cocaine and placed him in custody on that charge.[2] In Room 323, police found cocaine residue, weighing and packaging paraphernalia, and ledgers which appeared to relate to narcotics transactions. While conducting a crime scene investigation of Room 323, officers received incoming telephone calls from males who said they would "pick up." The officers, based on their training and experience, believed that prospective visitors were involved in drug trafficking. Two individuals later arrived at Room 323 and were arrested for being under the influence of cocaine.[3]

While in Room 323, Officer Jones received a call from Ms. Nygren, who told him that a man involved in the narcotics activity was on his way to Room 320. Officer Jones went out alone into the hallway, where he encountered Maggio knocking on the door to Room 320. Officer Jones asked Maggio to identify himself. Maggio gave his name but had no identification. Desiring to conduct a further investigation somewhere other than the hallway, Jones told Maggio to place his hands on his head. Officer Jones placed his left hand on top of Maggio's interlocked hands and unholstered his gun with his right hand, holding

---

1. Because Kalatschan had refused to allow maids to enter the room for the five days he had occupied it, the hotel manager feared that the premises were being abused and instructed the desk clerk to tell Kalatschan that the room had been rented to someone else.

2. After Kalatschan was identified by Ms. Nygren, Kalatschan was charged with possession of cocaine with intent to distribute.

3. These individuals were also found to be in the possession of cocaine.

the gun next to his right leg. Jones escorted Maggio to Room 323 and reholstered his gun upon entering the room.

Jones then told Maggio that he was not arresting Maggio but that he was conducting a narcotics investigation, read Maggio his *Miranda* rights, and asked Maggio to identify himself. After Maggio stated that he had no identification, Jones conducted a pat-down search for weapons and felt a large metallic bulge in Maggio's pocket. The bulge was several key chains containing numerous keys attached to one another that formed a chain about twelve inches long. Jones noticed keys to a Porsche and a Cadillac, and asked Maggio if he had driven the Porsche to the hotel. Maggio at first responded "yes," but then told Jones that he had driven the Cadillac.

Jones took the keys to the hotel parking lot, where he unsuccessfully tried the Cadillac key in several Cadillacs and then tried the Porsche key in the only Porsche parked in front of the hotel. Jones noted that the key fit the Porsche, but did not open the door to the vehicle. While standing outside the Porsche with the doors closed and locked, Jones observed a camera bag in the front seat of the car, with a sizeable amount of U.S. currency bulging from an open pocket. Jones returned to Room 323 to further question Maggio. Maggio admitted that the Porsche was his car and that it contained large quantities of cocaine and money. Maggio was then placed under arrest and again read his *Miranda* rights. After waiving his *Miranda* rights, Maggio consented to the search of his Porsche. Jones then searched the car, where he found $3,979 in currency in the pocket of the camera bag, approximately one-half kilo of marijuana,

approximately two and one-half kilos of cocaine, a loaded handgun, drug paraphernalia, and two locked briefcases. Upon further questioning, Maggio denied ownership of the briefcases.

The briefcases were taken to the police station and placed in an evidence locker. On July 10, 1984, officers obtained a search warrant for the two briefcases. Upon execution of the warrant by an Officer Asturias, police found approximately one-half kilo of cocaine, a scale and sifter, and $105,200 in U.S. currency.

In state court proceedings, Maggio successfully contended that the police had seized $109,179 in violation of his Fourth Amendment rights. The United States then commenced forfeiture proceedings in federal court. A federal magistrate judge concluded, after a hearing, that all circumstances and conduct leading to the discovery of the currency did not result in a violation of Maggio's Fourth Amendment rights. The judge further concluded that even if Maggio's rights had been violated, the evidence obtained by the warrant would not be suppressed because of *Leon*'s[4] good faith exception.

Thus, finding no basis to suppress the currency, the magistrate judge ruled that the Government had demonstrated probable cause for seizure and forfeiture of the currency and that Maggio had not met his burden of showing a legitimate source and intended use for the currency. Judgment of forfeiture was entered in favor of the Government. Maggio appeals.[5]

## II.

### A. *The Stop*

The propriety of a *Terry* stop is

---

4. *See United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).

5. This is the third time this case has come before us. In the first appeal, a panel of this court determined that the magistrate judge had applied an incorrect standard of review in his fact determination, and vacated and remanded for new findings of fact. *United States v. $109,179 in U.S. Currency*, No. 86–6038, 829 F.2d 1128 (9th Cir. Sept. 24, 1987)

(unpublished). When the case returned to this court after new fact findings, the appeal was dismissed after a panel determined that appellate jurisdiction was lacking because the district court never entered a final judgment. *United States v. $109,179 in U.S. Currency*, No. 86–6038, 1997 WL 303240 (9th Cir. June 4, 1997) (unpublished). That final judgment now having been issued, we now reach the merits of Maggio's appeal.

reviewed de novo.[6]

■■■ Maggio contends that Officer Jones had no reasonable suspicion that criminal activity was afoot when he approached Maggio outside of Room 320 and moved him to Room 323. Maggio argues that Jones knew that Room 320 had been cleared of people and drugs and thus that Maggio could not have committed a drug crime in Room 320. The inquiry, however, is not whether Maggio could have completed a drug transaction, but whether "a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot."[7] Police may detain an individual for the purpose of an investigation of criminal activity if the officers have reasonable and articulable suspicion that the suspect is engaging in criminal activity.[8] Because "reasonable suspicion . . . is not 'readily, or even usefully, reduced to a neat set of legal rules,'" we must consider the whole picture.[9]

When Officer Jones approached Maggio, he knew, in addition to the discovery of the drug operation in Room 323 and the arrest of Kalatschan and two other individuals, that: (1) approximately one pound of cocaine had been found in Room 320; (2) the room had been rented to Kalatschan for five days, during which time hotel staff were not permitted to enter the room; (3) after Kalatschan had been evicted from Room 320, two white males attempted to retrieve the cocaine; (4) one of those men, Kalatschan, was arrested for being under the influence and in the possession of cocaine; (5) the location of the other white male individual was unknown; (6) a witness had called the officers to notify them

that an individual involved in the drug operation was on his way to Room 320; and (7) Officer Jones found Maggio, a white male, knocking on the door to Room 320. Additionally, after the initial stop, Maggio failed to offer any form of identification or reason for being at the hotel, and he told inconsistent stories of how he arrived. Given these circumstances, a reasonable, articulable suspicion existed to support Officer Jones' initial stop and temporary, investigatory detention of Maggio.

## B. Stop or Arrest

■■■ The determination of whether an investigatory detention is a warrantless arrest or a Terry stop is reviewed de novo.[10] Maggio contends that his temporary detention escalated to an arrest when Officer Jones ordered him to place his hands on his head, unholstered a firearm, moved Maggio to Room 323, and detained him there for seventeen to twenty minutes.

■■■ "There is clearly no mechanical checklist to distinguish between Terry stops and formal arrest or the equivalent of arrest. Our review . . . turns on the particular facts and circumstances of each case."[11] When officers make a stop supported by reasonable suspicion, "they [are] authorized to take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop."[12] "A brief but complete restriction of liberty, if not excessive under the circumstances, is permissible during a Terry stop and does not necessarily convert the stop into an arrest."[13]

■■■ Officer Jones had reasonable suspicion to believe that Maggio was involved in a narcotics operation, and thus that he might be armed.[14] Requesting that Mag-

**6.** See United States v. Fuentes, 105 F.3d 487, 490 (9th Cir.1997).

**7.** Terry v. Ohio, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

**8.** See United States v. Sokolow, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989).

**9.** Id. (citation omitted).

**10.** See United States v. Torres–Sanchez, 83 F.3d 1123, 1127 (9th Cir.1996).

**11.** United States v. Parr, 843 F.2d 1228, 1231 (9th Cir.1988) (citations omitted).

**12.** United States v. Hensley, 469 U.S. 221, 235, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985).

**13.** United States v. Bautista, 684 F.2d 1286, 1289 (9th Cir.1982).

**14.** See United States v. Post, 607 F.2d 847, 851 (9th Cir.1979) ("It is not unreasonable to suspect that a dealer in narcotics might be armed.").

gio place his hands on his head was less intrusive than handcuffing him; Officer Jones never pointed his gun at Maggio but instead held it against his leg; and he moved Maggio only a short distance down the hall to Room 323. Neither handcuffing a suspect nor relocating a suspect automatically turns a detention into an arrest where these actions are reasonably taken for safety and security purposes.[15]

In *United States v. Alexander*,[16] the Second Circuit found police conduct reasonable where the officers approached a vehicle with their guns at their sides, ordered the occupants out of the vehicle, and then frisked them. These additional safety measures were justified because the occupants of the vehicle were believed to have just made a drug purchase and innocent bystanders were present on the street. Here, Officer Jones specifically suspected Maggio of involvement in the narcotics operation uncovered a short time before and believed precautions were necessary because a guest, employee, or visitor might have passed through the hotel hallway at any time. Given these circumstances, Officer Jones took reasonable steps to ensure his own safety and that of others.

Maggio relies heavily on the Supreme Court's decision in *Florida v. Royer*[17] to contend that, even if reasonable suspicion supported the stop, his detention escalated into an arrest without probable cause. *Royer*, however, presented a wholly different set of circumstances. Police stopped Royer in the airport concourse because he fit a "drug courier profile," and then asked him to accompany them to another room, described as a "large storage closet."[18] The Court determined that "[w]hat had

begun as a consensual inquiry in a public place had escalated into an investigatory procedure in a police interrogation room."[19] The police had retained Royer's ticket and identification, seized his luggage, and failed to inform him that he was free to board the plane.[20]

Here, on the other hand, Officer Jones had specific information that led him to suspect that Maggio was involved in a narcotics operation.[21] The housekeeper had informed him that a participant in the drug operation was on his way to Room 320, a white male suspect was still missing, and Maggio appeared at a vacant hotel room that had been used for drug trafficking for the previous five days. Moreover, Maggio could not produce any form of identification and provided inconsistent answers to Jones's simple question of how he had arrived at the hotel. Maggio thus not only failed to dispel, but in fact heightened, suspicions that criminal activity was afoot.[22]

Furthermore, the length of Maggio's detention was "justified by the circumstances authorizing its initiation."[23] The Supreme Court has stated:

> Obviously, if an investigative stop continues indefinitely, at some point it can no longer be justified as an investigative stop. But our cases impose no rigid time limitation on *Terry* stops. While it is clear that "the brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion," we have emphasized the need to consider the law enforcement purposes to be served by the

15. *See Halvorsen v. Baird*, 146 F.3d 680, 685 (9th Cir.1998); *Alexander v. County of Los Angeles*, 64 F.3d 1315, 1320 (9th Cir.1995).

16. 907 F.2d 269, 273 (2d Cir.1990).

17. 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).

18. *Id.* at 493–94, 103 S.Ct. 1319.

19. *Id.* at 503, 103 S.Ct. 1319.

20. *See id.*

21. *See Washington v. Lambert*, 98 F.3d 1181, 1189–90 (9th Cir.1996).

22. *See United States v. Sharpe*, 470 U.S. 675, 686–88, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985); *United States v. Torres–Sanchez*, 83 F.3d 1123, 1127–29 (9th Cir.1996).

23. *Pierce v. Multnomah County*, 76 F.3d 1032, 1038 (9th Cir.1996).

stop as well as the time reasonably needed to effectuate those purposes.[24] Maggio claims that his detention lasted seventeen to twenty minutes. Because Officer Jones suspected Maggio of involvement in a recently uncovered narcotics operation, and Maggio failed to produce any identification, Jones was justified in detaining Maggio for a short period of time in order to ascertain Maggio's identity. Under these circumstances, the length of the detention did not exceed a reasonable time[25] and Officer Jones acted reasonably in temporarily detaining Maggio in order to determine his identity.[26]

C. *The Frisk*

 "When the police ... have a reasonable suspicion that a suspect is armed, a *Terry* pat down for weapons is permissible."[27] "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."[28]

[A]n officer may conduct a limited protective search for concealed weapons if there is a reason to believe the suspect may have a weapon. The officer must choose between being sure that the suspect is not armed and jeopardizing his own safety. An officer making a stop under the suspicious circumstances of the present case who failed to patdown the suspect for weapons within the limited scope of *Terry* could be taking substantial and unnecessary risks.[29]

The purpose of the limited search is to allow officers to conduct investigations without fear of violence.[30]

Maggio claims that Officer Jones was not justified in conducting a frisk because Jones did not identify any bulges underneath his clothing before patting him down. We have noted that even in *Terry* the Court determined that it was reasonable to assume, from the nature of the offense contemplated, that Terry was armed and dangerous even though the officer had not observed a weapon or any physical indication of a weapon.[31] Because the police reasonably suspected Maggio of dealing in narcotics, it was not unreasonable to believe that he might be armed.[32]

Maggio also relies on *United States v. Thomas*[33] to note that because a stop is justified, it does not necessarily follow that police may also frisk the individual. In *Thomas*, we held that a pat-down search was not justified where the officer there "had no reason to continue the detention after he had asked his initial investigatory questions."[34] Here, on the other hand, Maggio's answers to Officer Jones' initial questioning failed to dispel Jones' reasonable suspicion that Maggio was armed and dangerous.

Officer Jones was in close proximity to an individual suspected of narcotics trafficking, his experience provided him with the knowledge that narcotics suspects are often armed and dangerous, and his belief that Maggio might be armed was not un-

**24.** *Sharpe,* 470 U.S. at 685, 105 S.Ct. 1568 (citation omitted).

**25.** *See Torres–Sanchez,* 83 F.3d at 1129 (holding that twenty-minute detention did not exceed permissible time limitations to convert a *Terry* stop into a de facto arrest).

**26.** *See Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).

**27.** *United States v. Flippin,* 924 F.2d 163, 166 (9th Cir.1991).

**28.** *Terry v. Ohio,* 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

**29.** *United States v. Mattarolo,* 209 F.3d 1153, 1158 (9th Cir.2000) (citations omitted).

**30.** *See Adams,* 407 U.S. at 146, 92 S.Ct. 1921.

**31.** *See United States v. Post,* 607 F.2d 847, 851 (9th Cir.1979) (citing *Terry,* 392 U.S. at 28, 88 S.Ct. 1868).

**32.** *See id.*

**33.** 863 F.2d 622, 628–30 (9th Cir.1988).

**34.** *Id.* at 629.

reasonable.[35] "The law does not require that an experienced [police officer], enclosed in a small room with a man he reasonably suspects to be a dealer in narcotics, be certain that a suspect is armed before he can make a limited pat-down for weapons."[36] Officer Jones' actions were reasonable under the circumstances.

### D. Key in Car Door Lock

█ Maggio claims that inserting his car key into the lock of the car door was a "search" of the car that required probable cause. He argues that *United States v. Portillo–Reyes*[37] stands for the proposition that such conduct constitutes a search. We disagree.

█ In *Portillo–Reyes*, we noted that the insertion of the key into a car door "constituted the beginning of the search."[38] In that case, however, the border agents did far more than determine whether the key fit the lock on the car door. Instead, they used the key to gain access to the interior of the vehicle and conducted a search of the passenger compartment, including the glove compartment. Here, on the other hand, once police found that the key fit the lock, they did not proceed any further until obtaining Maggio's consent.[39] Therefore, to the extent that *Portillo–Reyes* held that the insertion of the key into the lock was the *beginning* of a search, it is inapplicable here since there was no search that followed.[40]

We therefore must determine whether the insertion of a car key into the lock of a car door for the sole purpose of aiding the police in identification of an individual is, by itself, an unreasonable search proscribed by the Fourth Amendment. We faced a very similar issue in *United States v. Grandstaff.*[41] There, however, we "assume[d], without deciding, that the insertion of the key into the Bronco was a search for purposes of the fourth amendment" and upheld the "search" because police had probable cause to believe incriminating evidence would be found in the automobile.[42] Here, at the time the key was tried in the door of Maggio's car, police did not have facts sufficient to give rise to probable cause that Maggio's car would contain such evidence.[43] In the circumstances presented here, police were seeking only to identify which car in the hotel parking lot belonged to Maggio.

█ In order for an act to constitute a search in violation of the Fourth Amendment, the State must at least intrude into an area "in which there is a 'constitutionally protected reasonable expectation of privacy.' "[44] Moreover, even if the challenged action triggers the protections of the Fourth Amendment, a "minimally intrusive" action "may be reasonable in view of the government interests it serves."[45]

---

**35.** *See Post,* 607 F.2d at 851.

**36.** *Id.* at 852.

**37.** 529 F.2d 844 (9th Cir.1975).

**38.** *Id.* at 848.

**39.** Although Maggio challenges the voluntariness of his consent in his brief on appeal and raises other issues concerning California law, these issues are listed only in his "Statement of the Issues" and are not further discussed in his brief. These issues are therefore deemed waived. *See Resorts Int'l, Inc. v. Lowenschuss (In re Lowenschuss),* 67 F.3d 1394, 1402 (9th Cir.1995).

**40.** *Cf. United States v. DeBardeleben,* 740 F.2d 440, 444 (6th Cir.1984).

**41.** 813 F.2d 1353 (9th Cir.1987).

**42.** *Id.* at 1358.

**43.** The record indicates that police did not notice the large amount of currency bulging from an open camera bag and visible through the windows of the car until after they tried the key in the car door lock.

**44.** *New York v. Class,* 475 U.S. 106, 112, 106 S.Ct. 960, 89 L.Ed.2d 81 (1986) (quoting *Katz v. United States,* 389 U.S. 347, 360, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring)).

**45.** *United States v. White,* 766 F.2d 1328, 1330 (9th Cir.1985).

■ At most Maggio had a minimal expectation of privacy in the lock of his car door. The Supreme Court has held that "the physical characteristics of an automobile and its use result in a lessened expectation of privacy therein."[46] Moreover, the police may conduct limited searches of vehicles to ascertain ownership on less than probable cause.[47]

The intrusion upon Maggio's vehicle was also narrowly tailored to accomplish the purpose of the legitimate police investigation. Maggio gave police multiple stories of how he had arrived at the hotel, and he failed to provide any proof of identification. The police merely sought to identify Maggio through his ownership of his vehicle. "The intrusion upon [Maggio's] privacy was minimal. By inserting the key into the car door, the [police] sought to learn only one thing: which car belonged to [Maggio]."[48] Fitting the key into the car door lock did not give police any knowledge about the contents inside the vehicle, but revealed only that Maggio had access to that car. Given the strong governmental interests in investigating drug crimes, and Maggio's minimal privacy expectation in the lock on a car door, the police conduct here was reasonable under the circumstances.[49] Therefore, inserting the key into the car door lock for the purpose of identifying Maggio was not an unrea-

sonable search prohibited by the Fourth Amendment.[50]

AFFIRMED.

---

46. *Class,* 475 U.S. at 112, 106 S.Ct. 960; *see also Cardwell v. Lewis,* 417 U.S. 583, 590, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974) (plurality opinion) ("One has a lesser expectation of privacy in a motor vehicle because its function is transportation and it seldom serves as one's residence or as the repository of personal effects.").

47. *See United States v. Brown,* 470 F.2d 1120, 1122 (9th Cir.1972) (checking the interior of the car for vehicle registration); *Cotton v. United States,* 371 F.2d 385, 393 (9th Cir. 1967) (looking for the serial number of an automobile by opening the door does not constitute a search within the prohibitions of the Fourth Amendment).

48. *United States v. Grandstaff,* 813 F.2d 1353, 1358 (9th Cir.1987).

49. *Cf. White,* 766 F.2d at 1332 (finding no Fourth Amendment violation after finding border agent's pressing down on trunk was a reasonable intrusion given strong governmental interest in enforcing immigration laws).

50. *Cf. United States v. Concepcion,* 942 F.2d 1170, 1173 (7th Cir.1991) (finding no Fourth Amendment violation where police inserted keys into lock of apartment door because "the privacy interest [in the keyhole] is so small that the officers do not need probable cause to inspect it"); *United States v. DeBardeleben,* 740 F.2d 440, 445 (6th Cir.1984) (upholding insertion of a key into a car door lock because it was "merely a minimal intrusion, justified by a 'founded suspicion' and by the legitimate crime investigation").