**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

<table>
<tr>
<td>

UNITED STATES OF AMERICA,<br>
*Plaintiff - Appellee*,

v.

I.E.V., JUVENILE MALE,<br>
*Defendant - Appellant*.

</td>
<td>

No. 11-10337

D.C. No.<br>
4:11-cr-00929-<br>
DCB-JJM-1

OPINION

</td>
</tr>
</table>

Appeal from the United States District Court
for the District of Arizona
David C. Bury, District Judge, Presiding

Argued and Submitted
April 18, 2012–San Francisco, California

Filed November 28, 2012

Before: Alex Kozinski, Chief Judge, N. Randy Smith,
and Morgan Christen, Circuit Judges.

Opinion by Judge N.R. Smith;
Dissent by Chief Judge Kozinski

## SUMMARY[*]

### Criminal Law

Reversing the district court's denial of a motion to suppress evidence obtained through a frisk after a vehicle stop, the panel held that the *Terry* frisk was not justified at its inception and exceeded the scope of an appropriate *Terry* frisk.

Dissenting, Chief Judge Kozinski wrote that the majority opinion is wrong and dangerous.

### COUNSEL

John D. Kaufmann, Tucson, Arizona, for Appellant.

Craig H. Russell (argued), Office of the United States Attorney, Tucson, Arizona; Vivian H.W. Wang, United States Department of Justice, Washington, D.C., for Appellee.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**OPINION**

N.R. SMITH, Circuit Judge:

Where an officer reasonably believes that "the persons with whom he is dealing may be armed and presently dangerous," the officer may conduct a frisk or "pat-down" search of that person. *Terry v. Ohio*, 392 U.S. 1, 30 (1968). For a frisk to be valid, under this exception to the general rule requiring probable cause, the frisk must be both (1) "justified at its inception," and (2) "confined in scope" to a "carefully limited search of the outer clothing . . . in an attempt to discover weapons which might be used to assault" an officer. *Id.* at 20, 29-30. However, a frisk is not valid if it is a general exploratory search motivated out of a desire "to prevent the disappearance or destruction of evidence of crime." *Id.* at 29.

The *Terry* frisk here failed on both counts and amounted to nothing more than a prohibited fishing expedition for evidence. The police officers had no particularized suspicions directed at the unthreatening Defendant to justify the frisk at its inception. In addition, the searching officer exceeded the lawful scope of the frisk by lifting the Defendant's shirt to retrieve an object, because there is no evidence that the searching officer immediately recognized the object as a weapon or an unlawful item; the searching officer did not testify. Therefore, we **REVERSE** the district court's decision and **REMAND** with instructions to grant the Defendant's motion to suppress. Because we reverse on this issue, we do not address the other issues raised by the Defendant.

## I.  FACTS AND PROCEDURAL HISTORY

I.E.V., a juvenile male ("the Defendant"), appeals the district court's denial of his motion to suppress evidence gained through a frisk after a vehicle stop.  The Defendant was a passenger in a vehicle driven by his brother, Joseph Mendez, when they entered the United States Border Patrol Checkpoint near Whetstone, Arizona, about 100 miles from the Arizona/Mexico border.  There is no evidence that Mendez and the Defendant crossed the border on the day in question.  As the vehicle entered the primary inspection area of the checkpoint, a police dog displayed alert behavior that indicated the presence of a controlled substance or concealed humans in the vehicle.  Because of this alert, the vehicle was sent to secondary inspection where Mendez and the Defendant were asked to exit the vehicle by Officer Cooper.  After exiting, the canine did not alert on the Defendant or Mendez.  Upon request by Officer DeBusk, Mendez consented to a search of the vehicle.  Officer DeBusk asked the Defendant and Mendez a few questions and then performed a canine inspection of the vehicle, but no marijuana or other contraband was discovered in that inspection.

Neither Officer DeBusk nor Officer Cooper testified that they found the Defendant or Mendez to be threatening or likely to flee the scene.  Indeed, the district court noted that "Officer D[e]Busk did not find the passengers of the vehicle threatening nor did he observe any weapons."  Similarly, the district court noted that Officer Cooper "did not observe Mendez to be threatening or to attempt to flee."

The only specific evidence the Government offered to justify this frisk was that, once the Defendant and Mendez

had complied with the officers' requests, Officer Cooper testified that Mendez "seemed very nervous and continually touched his abdomen area," and the Defendant "displayed similar behavior." However, the district court did not credit Officer Cooper's testimony that the Defendant was also fidgeting and touching his abdomen, because the court noted that "Officer Cooper's arrest report made at the scene did not include any information on Defendant . . . acting nervous or fidgety as he had observed with Mendez."[1]

Officer Cooper also testified that, from his training, he knew that "narcotics and firearms go together." Based on that training and his observations of Mendez, Officer Cooper decided to perform a pat-down search of both Mendez and the Defendant. He and another officer performed the searches simultaneously. Officer San Ramon, the officer who frisked the Defendant, did not testify during the evidentiary hearing. Officer Cooper frisked Mendez. Officer Cooper found nothing on Mendez during this first search. However, during his search of the Defendant, Officer San Ramon asked the Defendant about an object he felt under his shirt. Then, without permission, Officer San Ramon lifted the Defendant's shirt to find a brick-shaped object taped on the Defendant's abdomen. After this first "brick" was found on the Defendant, Officer Cooper searched Mendez again and a similar brick-shaped object was found taped to his abdomen as well. The district court noted that the bundle found beneath the clothing was identified "only after the shirt was lifted" and the officers performed a "visual inspection of the bundle." Prior to that visual identification, Officer Cooper provided conflicting testimony explaining that, when he felt

---

[1] When the district court "interpret[ed] the evidence," it found only "nervous behavior and gestures of Mendez," but not the Defendant.

the "bulky object" on Mendez during his second pat-down, he believed it "could potentially be a weapon," but he also thought it was "a brick, potentially carrying marijuana."

After the marijuana was seized, both Mendez and the Defendant were placed under arrest. The Defendant filed a Motion to Suppress. The district court denied the motion after an evidentiary hearing. The district court determined that a frisk of both occupants of the vehicle for weapons was warranted based on the "totality of the circumstances": including "the proximity to the border, the canine alert to contraband, the nervous behavior and gestures of Mendez observed by Officer Cooper, and the experience of Officer Cooper that often individuals transporting contraband also carry firearms."

The case proceeded to a bench trial, where the Defendant was convicted. The Defendant timely appealed the district court's denial of the motion to suppress.

## II.  STANDARD OF REVIEW

We review de novo a district court's legal conclusions regarding the denial of a motion to suppress. *United States v. Brooks*, 610 F.3d 1186, 1193 (9th Cir. 2010). We review the district court's factual findings for clear error. *United States v. Davis*, 530 F.3d 1069, 1077 (9th Cir. 2008).

## III. DISCUSSION

In *Terry v. Ohio*, the Supreme Court created a limited exception to the general requirement that officers must have probable cause before conducting a search. 392 U.S. 1, 30 (1968). The Court held that officers may conduct an

investigatory stop consistent with the Fourth Amendment "where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot . . . ." *Id.* In addition, an officer may conduct a brief pat-down (or frisk) of an individual when the officer reasonably believes that "the persons with whom he is dealing may be armed and presently dangerous." *Id.* "[T]he stop and the frisk, must be analyzed separately; the reasonableness of each must be independently determined." *United States v. Thomas*, 863 F.2d 622, 628 (9th Cir. 1988).

In *Terry*, the Court also explained that the analysis regarding whether a frisk was constitutional "is a dual one," that asks (1) "whether the officer's action was justified at its inception," and (2) whether the officer's action was "confined in scope" by engaging in a "carefully limited search of the outer clothing . . . in an attempt to discover weapons which might be used to assault" an officer. *Terry,* 392 U.S. at 20, 29-30. The officer must provide "specific and articulable facts" that indicate something more than a general "governmental interest in investigating crime." *Id.* at 21, 23. Indeed, a pat-down "is not justified by any need to prevent the disappearance or destruction of evidence of crime. The *sole justification* of the search in the present situation is the protection of the police officer and others nearby . . . ." *Id.* at 29 (emphasis added) (citation omitted). Thus, the appropriate analysis is "whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* at 27.

Here, no one disputes that the officers had reasonable suspicion that criminal activity was afoot based on the canine alert, which justified the investigatory stop under *Terry*. In

this appeal, we only answer the following questions: (1) whether the decision to perform a frisk of the Defendant was justified at its inception by a reasonable suspicion that the Defendant was armed and dangerous, and (2) whether the pat-down stayed within the appropriate scope of *Terry*.

## A. The Officer Was Not Justified in Frisking the Defendant

The officers did not set forth the requisite "specific and articulable facts" such that a "reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* at 21, 27. No narcotics had been discovered prior to the pat-down of Defendant. There was no evidence that the Defendant was dangerous. At the suppression hearing, both officers testified that the Defendant and Mendez, two teenage boys surrounded by officers, acted in a compliant and nonthreatening manner. The frisk of the Defendant, essentially based on nothing more than the suspicion that drugs could be found, amounted to the type of "general exploratory search for whatever evidence of criminal activity [the officer] might find," which was specifically prohibited under *Terry*. *Id.* at 30. Accordingly, this pat-down was unconstitutional from its inception.

The Supreme Court has not allowed a general suspicion of drug activity to provide blanket authorization for frisking anyone in the vicinity. *See Ybarra v. Illinois*, 444 U.S. 85, 90-91 (1979). For example, in *Ybarra*, the officers had a warrant based on probable cause to search a tavern for drugs. *Id.* However, they violated the Fourth Amendment when the officers also frisked a patron in the tavern who was not recognized by the police, "made no gestures or other actions indicative of an intent to commit an assault, and acted

generally in a manner that was *not threatening*." *Id.* at 93 (emphasis added). Thus, under *Ybarra*, something more than a knowledge of drugs in close proximity is required to justify frisking a suspect.

In a case where we allowed a pat-down of a suspect in a drug deal, more factors than a mere proximity to suspicious indicators of drugs provided evidence that the suspect might have been armed and dangerous. *See United States v. $109,179 in U.S. Currency*, 228 F.3d 1080 (9th Cir. 2000). In *U.S. Currency*, we held that it was reasonable to assume that a suspect was armed and dangerous, because he knocked on the door of the room known to be involved in a drug deal, the suspect's answers to brief initial questioning failed to dispel the officer's suspicion that he was armed and dangerous, and the solitary officer was in "close proximity" to the suspect in a "small room." *Id.* at 1086-87. The officer also conducted the frisk *before* conducting "further investigation." *Id.* at 1082.

Similarly, in a Sixth Circuit case cited by the Government, *United States v. Jacob*, 377 F.3d 573 (6th Cir. 2004), the suspect was an individual who had previously been arrested for transporting narcotics, a canine had alerted on his vehicle, the suspect was engaging in counter surveillance, bags that looked like they contained drugs were transported to the vehicle, and when officers tried to pull the vehicle over it lunged forward to escape. *Id.* at 575-76. As in *U.S. Currency*, the officers *immediately* patted down the suspect after he exited the vehicle, because the officers' suspicions caused concern *for their safety* and warranted a pat-down before further inspection. *Id.* at 576.

The foregoing cases dealt with more substantiated evidence of a drug transaction, and the drug activity appeared to be one of many factors the courts considered, rather than the dispositive factor.  Furthermore, the officers' suspicions caused them to frisk the suspect before further investigation occurred.

The present case is quite different from *U.S. Currency* and *Jacobs*.  Here, the officers had no concrete evidence that drugs were in the area.  It is true that a canine alerted on the vehicle in which the Defendant was a passenger, but the district court noted that this alert could be caused by *either* contraband or hidden humans.  The canine alert did not signify the presence of a weapon.  Further, after the initial stop of the vehicle, Officer DeBusk brought his dog past the Defendant and Mendez, and the district court found that "[t]he canine did not alert when it went past [the Defendant]."  No contraband had been found or identified in the vehicle or on Mendez before the Defendant was searched.

Moreover, in this case, both officers testified that the Defendant acted in a non-threatening and compliant manner.  This is similar to the compliant suspect who was unconstitutionally frisked in *Ybarra*, and unlike the suspect in *Jacobs* who was charging police officers in his vehicle.  Moreover, the Defendant was a young teenager surrounded by three police officers, rather than a man confronting a solitary officer in a confined space, as in *U.S. Currency*.  Therefore, the officers' general suspicion of drugs did not justify the frisk of Defendant.[2]

---

[2] While two people in a car may sometimes be in "cahoots," as the dissent points out, we note that the officers largely completed their investigatory tasks before frisking Mendez, the fidgety one.  It was only

The Government's argument that the Defendant's nervous behavior justified his frisk is also not persuasive, because the district court discredited this testimony after noting that "Officer Cooper's arrest report made at the scene did not include any information on Defendant . . . acting nervous or fidgety as he had observed with Mendez." Far from being clearly erroneous, *Davis*, 530 F.3d at 1077, we agree with the district court's dismissal of this self-serving testimony. We are required to accept this factual finding by the trial court, and the Government is left with no specific suspicious behavior directly attributable to the Defendant.[3]

The district court determined that the frisk of the Defendant was still justified based, in part, on the Defendant's proximity to Mendez, who was acting fidgety. But the Supreme Court has made clear that "a person's mere

---

after marijuana was found on the Defendant that Officer Cooper did a second frisk of Mendez and then discovered marijuana. This is not a situation where officers felt at risk when they stopped the vehicle and took steps to neutralize any threats presented by first patting down a fidgety driver and his possible partner in crime before they felt comfortable asking questions and searching the vehicle. It would be clearly unreasonable to prevent officers from frisking an individual during an investigatory stop when they reasonably believe him to be armed and presently dangerous. However, the Government did not present articulable facts that such a belief was present in this case. Indeed, the officers' actions demonstrate that they did not fear for their safety. Given the totality of the circumstances, it seems our Chief Judge would have been diving alone into the nearest ditch.

[3] Indeed, when pressed at oral argument to provide any evidence specific to the Defendant that would give rise to a suspicion that he possessed a weapon, the Government was unable to provide any such evidence, and instead focused on the location of the vehicle, which was approximately 100 miles from the border, and a general suspicion of drugs based on the canine alert.

propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." *Ybarra*, 444 U.S. at 90-91; *see also Aguilera v. Baca*, 510 F.3d 1161, 1176 (9th Cir. 2007) (Kozinski, C.J., dissenting) ("That one member of a group may have committed a crime doesn't establish probable cause to arrest everyone in that group." (citing *United States v. Brown*, 951 F.2d 999, 1003 (9th Cir.1991))). The "narrow scope" of the *Terry* exception only permits a frisk for weapons based on "a reasonable belief or suspicion *directed at* the person to be frisked . . . ." *Ybarra*, 444 U.S. at 94 (emphasis added). Similarly, the Sixth Circuit has held that the "undeniably suspicious" behavior of a driver of a vehicle, while warranting a pat-down of the driver, was "not enough . . . to justify a pat-down search of [the passenger]." *United States v. Wilson*, 506 F.3d 488, 493, 495 (6th Cir. 2007).[4]

---

[4] The only situation where our Circuit has allowed the search of a suspect's companion involved a case where the search was incident to a lawful arrest. *United States v. Berryhill*, 445 F.2d 1189, 1193 (9th Cir. 1971). However, the Government has not pursued a theory of search incident to lawful arrest on appeal after recognizing that Mendez was not arrested before the Defendant was frisked. The reasoning of *Berryhill* also does not apply to a *Terry* frisk for at least two reasons. First, *Berryhill* only allowed a pat-down of "companions of the arrestee." *Id*. But the arrest was performed after obtaining a warrant, which requires probable cause—a much higher standard than the requisite reasonable suspicion for a *Terry* frisk. *See Michigan v. Long*, 463 U.S. 1032, 1059 (1983) (Brennan, J., dissenting) (noting "a vital difference between searches incident to lawful custodial arrests and *Terry* protective searches"). Here, the Defendant was not the companion of an arrestee, but was merely the companion of another individual who was subject to a *Terry* search, the constitutionality of which is also debatable. Second, the court made clear in *Berryhill* that it was "not here concerned with the admissibility of the seized evidence against" the companion who was searched; the evidence was only being used against the arrestee, who could not "complain of a violation of [his companion's] personal rights under the Fourth

Thus, the district court's reliance on Mendez's fidgety behavior to justify the Defendant's pat-down was in error.

Furthermore, even if Officer Cooper's testimony that the Defendant was fidgeting could be credited, such behavior was not sufficient to warrant a frisk of the Defendant for two reasons. First, we join with our sister circuits that have refused to allow police officers to justify a *Terry* search based on mere nervous or fidgety conduct and touching of clothing. *See Wilson*, 506 F.3d at 495 ("Nervous behavior, standing alone, is not enough to justify a *Terry* search."); *United States v. McKoy*, 428 F.3d 38, 40 (1st Cir. 2005) (explaining that "[n]ervousness is a common and entirely natural reaction to police presence" and the defendant's gestures in this case, while potentially to hide a weapon, were also consistent with reaching for a driver's license, and thus the Government's proposed standard "comes too close to allowing an automatic frisk of anyone" the officer stops); *United States v. Ford*, 333 F.3d 839, 842, 845 (7th Cir. 2003) (Despite the fact that the defendant "appeared nervous, looked around, stepped backward and reached for his pocket after he activated [a] metal detector," the court held this "was insufficient to create a reasonable suspicion that would justify a protective pat-down.").

Second, the officers' actions demonstrate that, even if they had a hunch that weapons could be in the area, they did not have the required "immediate" need to protect themselves or others from danger. *Terry*, 392 U.S. at 23. Officer

---

Amendment." *Berryhill*, 445 F.2d at 1193. In contrast, in this case the admissibility of the evidence *is* being used against the companion who was searched, which is a completely different legal question from the one at issue in *Berryhill*.

DeBusk testified that it was a minute or two before he approached the vehicle, after it had already been stopped. The Defendant and Mendez were asked to exit the vehicle and step about 10 to 15 feet away.  Afterward, Officer DeBusk asked them a few questions.  The canine then sniffed the Defendant and Mendez, but did not alert on them.  Officer DeBusk then asked for and received consent to search the vehicle.  Only after Officer DeBusk performed a "walk around" the vehicle with the canine and found no drugs, did the other officers begin their frisk of the Defendant and Mendez.

The fact that an officer had already completed a large portion of his investigation of the vehicle without facing any threatening behavior undermines the "well-settled . . . purpose of a *Terry* stop . . . to allow the officer to pursue his investigation without fear of violence." *United States v. Miles*, 247 F.3d 1009, 1012 (9th Cir. 2001) (internal quotation marks omitted); *see also Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993) ("The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence . . . .") (internal quotation marks omitted).

Indeed, the timing of the officers' search here is markedly different from that in *U.S. Currency* (where, after the suspect was unable to provide any identification, the officer immediately took the suspect into a nearby room and frisked him before conducting any further investigation), or from *Jacobs* (where the officers immediately frisked the suspects after they exited the vehicle).  Rather, this case is more analogous to *United States v. Thomas*, where the officer did not immediately frisk the suspect, but instead asked some investigatory questions first.  863 F.2d at 628.  There, though

the suspect did not give suspicious answers and did not behave in a threatening manner, the officer decided to frisk him after some investigation. *Id.* We explained that a "lawful frisk does not always flow from a justified stop," and the officer "had no reason to continue the detention after he had asked his initial investigatory questions . . . ." *Id.* at 628-29. The officer in *Thomas*, as well as the officers in this case, demonstrated a "perfunctory attitude towards frisking a suspect once a justified stop has occurred." *Id.* at 629. This attitude is prohibited under our precedent, because it is at odds with *Terry*'s requirement that courts analyze a frisk based on "whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27.

The district court's conclusion to the contrary appears to have been based in part on two legal errors. First, the district court erroneously concluded that the pat-down search in this case required "minimal suspicion," because it was a type of "border search." The district court cited to *United States v. Vance*, 62 F.3d 1152, 1156 (9th Cir. 1995), a case applying the more lenient border search doctrine. However, this was absolute error. The Government does not even argue that this was a border search. Further, there is no dispute that this is not a border search, because nothing in the record supports a theory that the Defendant had crossed the border.[5]

---

[5] Our Circuit "has previously recognized only two circumstances when a car and its passengers are properly subject to 'extended border searches' away from the border." *United States v. Perez*, 644 F.2d 1299, 1302 (9th Cir. 1981). The first circumstance is where the "officers can determine 'with reasonable certainty' that any contraband which might be found in the vehicle was aboard the vehicle when it crossed the border." *Id.* (quoting *Alexander v. United States*, 362 F.2d 379, 382 (9th Cir. 1966)). The second circumstance where an "extended border search is valid" is

Second, the district court explained that "[a] frisk is justified when law enforcement suspects weapons or drugs, based on the totality of the circumstances, as well as to protect themselves."   In other words, the district court erroneously assumed that a frisk is justified *either* if an officer suspects weapons *or* drugs.  However, *Terry* makes clear that the "*sole justification*" for a pat-down is the protection of the police officer and others nearby.  *Terry,* 392 U.S. at 29 (emphasis added).

In sum, the officers' argument that their safety was in danger is contradicted by the absence of any suspicious behavior directly attributable to the Defendant, the scant evidence of drug possession prior to the frisk, the lack of immediate actions by officers to ensure safety, and the non-threatening and compliant behavior of two teenagers, one of them a minor, surrounded by officers in an open area.  None of the underlying facts found by the district court was clearly erroneous.  *Davis*, 530 F.3d at 1077.  Accordingly, the frisk of the Defendant was unconstitutional from its inception.[6]

---

when "customs agents are 'reasonably certain' that parcels have been smuggled across the border and placed in a vehicle, whether or not the vehicle itself has actually crossed the border." *Id.* (quoting *United States v. Weil*, 432 F.2d 1320, 1323 (9th Cir. 1970)).  "[R]easonable certainty is a stricter standard than probable cause." *Id.* (internal quotation marks omitted) (citing *United States v. Kessler*, 497 F.2d 277, 279 (9th Cir. 1974)).  There is no dispute that neither factual situation occurred in this case.

[6] Contrary to the dissent's assertion, we reach this conclusion after considering the totality of the circumstances.  These circumstances did not "'warrant[] further investigation.'" *United States v. Arvizu*, 534 U.S. 266, 274 (2002) (quoting *Terry*, 392 U.S. at 22).  In considering the totality of the circumstances, the dissent cites proximity to the border.  However, the Government did not argue that this was a border search, nor could it have.

Though we take no satisfaction in the consequence that a possessor of marijuana will escape punishment in this case, our overriding concern is that to hold otherwise would allow police officers to frisk every individual in a vehicle stopped based on reasonable suspicion of criminal activity. Such a justification would turn *Terry* frisks into exactly the type of exploratory searches for evidence, rather than safety searches for weapons, that the Supreme Court has prohibited, thus allowing "[t]he needs of law enforcement" to "decimate[] the protections [of] the Fourth Amendment . . . ." *United States v. Pineda-Moreno*, 617 F.3d 1120, 1121 (9th Cir. 2010) (Kozinski, C.J., dissenting from denial of rehearing en banc).

## B. The Officer's Frisk Exceeded its Constitutional Scope

Even if the officer was justified in his initial decision to perform a pat-down search of the Defendant, we conclude that the officer's search exceeded the scope of an appropriate *Terry* frisk.

An officer's seizure of contraband during a *Terry* search is constitutional if "a police officer lawfully pats down a suspect's *outer clothing* and feels an object whose contour or mass makes its identity *immediately apparent* . . . ." *Dickerson*, 508 U.S. at 375 (emphasis added). A search exceeds the proper scope if "the incriminating character of [an item is] not immediately apparent" but is discovered

---

The search took place 100 miles from the border and there is no evidence that the Defendant and Mendez crossed it. The dissent also cites the fact that the canine alerted to contraband. However, it is undisputed that when the canine first alerted, it could have been in response to either contraband *or* concealed humans in the vehicle, but not weapons.

"only as a result of a further search . . . ." *Id.* at 379; *see also Miles*, 247 F.3d at 1013-14.

In analyzing the objective reasonableness of an officer's search, precedent from our Circuit and the Supreme Court prevents a court from assuming that an officer "might legitimately have been looking for" a weapon. *Miles*, 247 F.3d at 1015. *See also Terry*, 392 U.S. at 21 ("And in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which taken together with rational inferences from those facts, reasonably warrant that intrusion."); *Arvizu*, 534 U.S. at 273 (we must look at the totality of the circumstances to see whether "the detaining officer has a particularized and objective basis for suspecting the legal wrongdoing") (internal quotation marks omitted); *United States v. Willis*, 431 F.3d 709, 716 & n.6 (9th Cir. 2005) (we must inquire into "facts that [the officer] knows" when conducting objectively reasonable analysis; "articulable facts" as opposed to "subjective motivations" are the proper focus).

Indeed, in *Miles*, because the officer did not testify, we refused to speculate that the officer was legitimately looking for a weapon. *See Miles*, 247 F.3d at 1015. This prevents a pat-down from becoming a search for a "needle in a haystack" where "there would be no limit to the bounds of a *Terry* stop." *Id.*; *see also Dickerson*, 508 U.S. at 377-78 (noting that the officer who searched the defendant never actually "claim[ed] that he suspected th[e] object to be a weapon"); *United States v. Mattarolo*, 209 F.3d 1153, 1155-56 (9th Cir. 2000) ("[T]he arresting officer . . . testified at the suppression hearing" regarding the fact that he "immediately recognized [the item] as drugs" based on "the distinctive feel and his experience gained from thirty to forty patdowns").

Here, the only testimony about the search of the Defendant comes from the Defendant himself, because Officer San Ramon never testified. When asked how the officers searched him, the Defendant answered, "They told me to place my hands behind my back and then they searched me like going down, and then they asked – they felt the object and asked me what it was and they lifted up my shirt." This record does not allow any reasoned conclusion about what Officer San Ramon identified before he lifted the shirt. The Government bears the burden of proving that the incriminating character of an object was immediately identifiable, rather than the burden being on the Defendant to prove otherwise. Thus, as in *Miles*, we cannot assume that the officer "might legitimately" have been searching for a weapon when he lifted the Defendant's shirt; the searching officer did not testify regarding the reasons for the search. 247 F.3d at 1015.

The conflicting testimony of Officer Cooper, the other searching officer, makes it impossible for us to discern from the record whether Officer San Ramon was able to immediately identify the bundle he felt on the Defendant's person.

Officer Cooper, who searched Mendez, testified that based on his "training and experience," he identified the brick-shaped object as one potentially carrying marijuana, but Officer Cooper did not detect the "brick" on his first search of Mendez, and on his second pat-down, he identified it "only after[]" he had "lifted up [Mendez's] shirt . . . ." Before that visual identification, Officer Cooper provided conflicting testimony explaining that, when he felt the "bulky object," he believed it "could potentially be a weapon," but he also

thought it was "a brick, potentially carrying marijuana."[7] This contradictory evidence belies a conclusion that Officer San Ramon was able to immediately identify the "incriminating character" of the object beneath the Defendant's shirt.[8]

The district court made no specific findings regarding the specific and articulable facts behind Officer San Ramon's seizure of the contraband, other than to note that "the frisk of [the Defendant] resulted in the discovery of the bundle of contraband taped to his abdomen" which was a "sufficient basis to conduct a second search of Mendez." Thus, similar to *Dickerson* and *Miles*, even if "the officer was lawfully in a position to feel the lump" under the Defendant's shirt, because Officer San Ramon did not testify, we are left with the conclusion that "further search was 'constitutionally invalid' because 'the incriminating character of the object was not immediately apparent.'" *Miles*, 247 F.3d at 1014 (quoting *Dickerson*, 508 U.S. at 378-79).

---

[7] Moreover, Officer Cooper's stated belief that this bulky object could potentially be a weapon is highly suspect, because the district court determined that Officer Cooper only found this bulky object during his second search of Mendez, which occurred after the first bundle had already been found on the Defendant and identified as a brick of marijuana, not a weapon. This finding is not clearly erroneous.

[8] The dissent argues that "[u]nder the collective knowledge doctrine, San Ramon knew everything Cooper knew" without recognizing that Cooper himself did not have reasonable suspicion to initiate the search of Defendant; imputing Officer Cooper's knowledge to Officer San Ramon does not render this a lawful search. *See United States v. Ramirez*, 473 F.3d 1026, 1037 (9th Cir. 2007) (at least one officer must know "facts constituting reasonable suspicion or probable cause" to avoid violating the Fourth Amendment).

Therefore, because the officer who searched the Defendant did not testify to the specific and articulable facts giving rise to the search, and because it is not obvious from the record that the officer immediately identified the bundle on the Defendant as contraband or a weapon, the search of the Defendant exceeded the scope of a constitutional *Terry* search.

## IV. CONCLUSION

For the foregoing reasons, we **REVERSE** the district court's decision and **REMAND** with instructions to grant the Defendant's motion to suppress.

Chief Judge **KOZINSKI**, dissenting:

Two words best describe the majority opinion: "wrong" and "dangerous." The majority sifts through the facts one by one and finds that none of them justifies the search of I.E.V. But the Supreme Court has rejected this approach. *United States* v. *Arvizu*, 534 U.S. 266, 274–75 (2002). The district court got it right when it found that "[t]he frisk of [I.E.V. and his brother, Mendez,] was warranted based on the *totality of the circumstances*: the proximity to the border, the canine alert to contraband, the nervous behavior and gestures of Mendez . . . and the experience of Officer Cooper[, who directed the frisks,] that often individuals transporting contraband also carry firearms." (Emphasis added.)

It doesn't matter whether I.E.V. exhibited the same nervous behavior as his brother. Though "mere propinquity to others independently suspected of criminal activity" isn't

enough, *Ybarra* v. *Illinois*, 444 U.S. 85, 91 (1979), two people riding in the same car in the middle of nowhere can reasonably be presumed to be in cahoots. If one of them gives signs of having a concealed weapon, it's reasonable to suspect the other might too. *See United States* v. *Berryhill*, 445 F.2d 1189, 1193 (9th Cir. 1971) (discussing *Terry* v. *Ohio*, 392 U.S. 1 (1968)). No officer who values his life would assume otherwise.

Once Officer San Ramon felt a hard object under I.E.V.'s shirt, he was eminently justified in looking to see what it was. *See Terry*, 392 U.S. at 25–27; *Minnesota* v. *Dickerson*, 508 U.S. 366, 374–76 (1993); *Berryhill*, 445 F.2d at 1192–93. Unlike cases where police felt a small lump, *Dickerson*, 508 U.S. at 369, 378–79, or a matchbox-sized container, *United States* v. *Miles*, 247 F.3d 1009, 1011–12 (9th Cir. 2001), there was a "very large bulky object" taped to I.E.V.'s stomach. Common sense tells us that people engaged in legitimate business don't tape bricks to their bodies. This would be true even if the encounter had been on a street corner in Pocatello, but at a checkpoint on a highway heading from the Mexican border, after a dog had alerted to possible drugs? Any officer who sent I.E.V. on his way without finding out what he was hiding under his shirt should have been fired for incompetence.

My colleagues ignore these intractable realities and focus instead on irrelevancies. They mention twice (so they must think it's pretty important) that the dog didn't alert to weapons. Maj. Op. 10, 16 n.6. But the dog did alert to possible illegal activities that are often accompanied by firearms. The majority also mentions twice (ditto) that the dog alerted to possible drugs *or* humans, as if this matters. *Id.* at 10, 16 n.6. It doesn't: If the dog alerts to something

that might be drugs or humans, that something could be drugs.

The majority mentions three times (ditto!) that I.E.V. and his brother were teenagers, as if *that* matters. Maj. Op. 8, 10, 16. Teenagers are perfectly capable of carrying drugs and killing people with guns. *Teen kills cop, then self*, Chicago Tribune (June 20, 2007), *available at* http://articles.chicagotribune.com/2007-06-20/news/07062 00859_1_kills-teen-cop.

The majority mentions four times (DITTO!!!) that San Ramon didn't testify, Maj. Op. 3, 5, 19, 20, and argues that we may not "assum[e] that [he] 'might legitimately have been looking for' a weapon," *id.* at 18 (quoting *Miles*, 247 F.3d at 1015). But San Ramon's actual thought processes are irrelevant; we look at the situation from the point of view of a reasonable officer. *See Terry*, 392 U.S. at 21–22. None of the cases the majority cites support the proposition that the searching officer must testify, and it makes no sense. Cooper gave the order to frisk I.E.V. and he testified why he believed I.E.V. was armed. Under the collective knowledge doctrine, San Ramon knew everything Cooper knew. *United States* v. *Ramirez*, 473 F.3d 1026, 1033 (9th Cir. 2007). From I.E.V.'s testimony, we also know that San Ramon felt a large, bulky object concealed on him that almost certainly was contraband or weapons. The majority doesn't explain what possible difference San Ramon's personal narrative would have made.

The majority claims four times (*id.*) that Cooper's testimony is "conflicting" or "contradictory," Maj. Op. 5-6, 19-20, but Cooper's testimony was perfectly consistent. Cooper testified on direct that the large concealed object he felt could have been contraband and also, on cross, that it

could have been a weapon. An unknown object could be contraband and could also be a weapon, just as a cat locked in a steel chamber for an hour could be alive and could also be dead.

Because none of this gets the majority where they want to go, they indulge in some appellate fact-finding. According to the majority, the officers didn't frisk the subjects until the search of the car was pretty much completed, which "demonstrate[s] that, even if [the officers] had a hunch that weapons could be in the area, they did not have the requisite 'immediate' need to protect themselves or others from danger." Maj. Op. 13. But my colleagues overlook I.E.V.'s own testimony:

> Q. How long after the dog moved away [from sniffing you] did they—did they start to search you?
>
> A. Probably right after.

This is entirely consistent with Officer DeBusk's testimony:

> Q. While you were conducting the canine inspection of the vehicle in secondary, was there at the same time a search being done of the persons of [I.E.V.] and the driver Mr. Mendez?
>
> A. They were interviewing them. And while I was directing my dog in a sniff of the vehicle, they performed a search on the subjects.

Deciding when to frisk suspects is a difficult and sensitive question. We want officers to be safe, but we also don't want to subject individuals to the indignity and intrusion of a frisk without sufficient cause. Here, the initial dog alert provided *some* indication of drugs, and hence gave rise to some suspicion that firearms might be involved, but perhaps not enough. So the officers acted cautiously and didn't conduct a frisk immediately after the brothers were sent to secondary. But once I.E.V. and Mendez were out of the vehicle, Cooper found an additional reason to worry: "[Mendez] seemed very nervous and continually touched his abdomen area." That additional observation gave Cooper sufficient cause to conduct a frisk, and he did so right after DeBusk and the dog went to search the car; the frisk was completed, and the marijuana was discovered, while DeBusk's walk-around of the vehicle was in progress.

The district court never found that the officers unnecessarily delayed in frisking I.E.V. and Mendez; nor did I.E.V. raise the argument below or on appeal. The lackadaisical-search rationale is the majority's own invention. My colleagues embark on a fact-finding expedition based on a cold record, without any input from the parties, and draw conclusions about the state of mind of the officers conducting the search. Who needs district judges when we can do all that on our own?

But my colleagues create a much bigger problem than merely usurping the district court's role. The majority's attempt to wring out of the record some sort of proof that these officers were not *really* worried about weapons, Maj. Op. 13-15, flies in the face of a solid wall of authority that we must view the situation through the eyes of an objective officer, *see, e.g.*, *Terry*, 392 U.S. at 21 ("And in making [the

reasonable suspicion] assessment it is imperative that the facts be judged against an *objective* standard . . . ." (emphasis added)); *Arvizu*, 534 U.S. at 273 (similar); *Whren* v. *United States*, 517 U.S. 806, 812–14 (1996) ("[T]he Fourth Amendment's concern with 'reasonableness' allows certain actions to be taken in certain circumstances, *whatever* the subjective intent.").

The Seventh Circuit has expressly rejected the majority's lackadaisical-search rationale for precisely this reason:

> The elapsed time [from the stop to the frisk] is the only evidence Adamson cites in support of his position that the officers were not concerned with their safety at the time of the search. This argument addresses whether the officers, having not immediately patted him down, subjectively believed that he was armed. But reasonable suspicion is measured against the totality of the circumstances, and the test is objective.

*United States* v. *Adamson*, 441 F.3d 513, 521 (7th Cir. 2006); *accord United States* v. *Barnett*, 505 F.3d 637, 639–40 (7th Cir. 2007); *see also United States* v. *Menard*, 95 F.3d 9, 11 (8th Cir. 1996) (recognizing that an officer may have legitimate reasons for delaying a pat-down of a suspect). The majority's foray into appellate fact-finding puts us on the wrong side of a circuit conflict.

It's easy enough, sitting safely in our chambers, protected by U.S. Marshals with guns and dogs, surrounded by concrete barriers and security cameras, to say that officers in the field had no cause to fear for their safety. But if we'd been there

when I.E.V. and his brother pulled up in their car, heard the police dog alert and seen one of the suspects fidget like he was reaching for a weapon, I'd have dived for cover into the nearest ditch, and my guess is I wouldn't have been the first one there.