**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-3780
_____

UNITED STATES OF AMERICA

v.

WILLIS WHEELER,
                                        Appellant
_____

On Remand from the Supreme Court of the United States
on June 3, 2019

Submitted on Remand:  August 24, 2021

Before:  CHAGARES, MATEY, Circuit Judges, and BOLTON, District Judge<sup>*</sup>.

(Filed: September 10, 2021)

Lisa B. Freeland
Renee Pietropaolo (ARGUED)
Office of Federal Public Defender
1001 Liberty Avenue
1500 Liberty Center
Pittsburgh, PA 15222

    Counsel for Appellant

Adam N. Hallowell
Laura S. Irwin
Donovan J. Cocas (ARGUED)
Office of United States Attorney
700 Grant Street, Suite 4000

_____

<sup>*</sup> The Honorable Susan R. Bolton, Senior United States District Judge for the District of Arizona, sitting by designation.

Pittsburgh, PA 15219

————————————

OPINION[*]

————————————

CHAGARES, Circuit Judge.

Willis Wheeler appeals from his conviction after a jury trial of conspiracy to distribute one kilogram or more of heroin, possession with intent to distribute 100 grams of heroin, and possessing a firearm despite being a convicted felon. Wheeler raises a myriad of challenges to the admissibility of a number of statements made by case agents and Government experts; the sufficiency of the evidence; the admissibility of evidence acquired after an allegedly warrantless search of an apartment Wheeler used; the District Court's refusal to give a multiple-conspiracies instruction; and the admission of evidence seized from an alleged co-conspirator nearly a year after the termination of the conspiracy. We affirmed the District Court's judgment in 2018. Thereafter, the First Step Act of 2018 (the "First Step Act"), Pub. L. No. 115-391, 132 Stat. 5194, was enacted. The Supreme Court subsequently vacated our decision and remanded so that we could consider the effect of the newly enacted First Step Act. While this case was on remand, the Court decided Rehaif v. United States, 139 S. Ct. 2191 (2019). As explained

————————————

[*] This disposition is not an opinion of the full court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

2

below, the First Step Act does not apply to Wheeler, and we will not vacate his conviction for plain error under Rehaif. Because we also conclude, as we did earlier, that his other arguments lack merit, we will affirm.

I.

The investigation culminating in Wheeler's conviction began with the FBI's Safe Streets Gang Task Force investigation, beginning in March 2011, of heroin distribution by gang members in the East Hills Housing Project in Pittsburgh. Through undercover agents and wiretaps, the investigators determined that Richard Bush was one of the group's drug makers and that Bush procured his drug-making material (other than the heroin itself) from Mayank Mishra. Mishra owned Rock America, a store that ostensibly sold concert "swag," but whose real profit came from the sale of stamp bags (used to package heroin for individual sale), diluents (cutting agents), and other drug paraphernalia to Pittsburgh drug dealers. Investigators intercepted calls between Bush and Mishra, in which, for instance, Bush ordered diluents and cases of colored and personalized stamp bags and discussed his heroin recipe.

In these conversations, Bush described his heroin-processing lab and how even breathing in the fumes there made him "high as a motherf****r." Supplemental Appendix ("Supp. App.") 12. He repeatedly referenced his "dude," "man," or "guy" who advanced the money to make purchases from Mishra, who warned him that he thought Mishra's shop had been raided, and to whom Bush would recount drug-testers' one-to-ten ratings of the quality of the heroin that Bush produced. Id. Further investigation

3

revealed that Bush's lab was in his 10-by-10-foot basement, accessible from his attached garage. In January 2012, officers set up a pole camera overlooking the garage. From the footage, they identified Wheeler, who would arrive at Bush's home, use a remote in his car to open the garage door, and would often stay for seven or more hours.

Wheeler would text Bush that he was on his way over, but based on a comparison of the expected travel time between Wheeler's home and Bush's with Wheeler's actual arrival time, investigators believed that Wheeler was making a stop before reaching Bush. Allegheny County Sheriff's Deputy Richard Barrett — a lead investigator — believed that Wheeler was stopping at a stash house to pick up raw heroin. Few calls were intercepted between Bush and Wheeler. However, in one call between Bush's wife Sylvia and Bush, Sylvia told Bush that Wheeler was "downstairs in the basement," to which Bush replied, "Alright, tell him I'll be there." Supp. App. 88. Other calls appeared to show Wheeler asking Bush what stamp bags to buy (the "joints" call) and Wheeler telling Bush that he thought he was being surveilled by police (the "weird" call). Given this information, investigators believed that Wheeler was Bush's heroin supplier.

Police executed simultaneous search warrants on Bush and Wheeler (as well as their homes and cars) on March 14, 2012. Given the investigators' belief that Wheeler had in the past spotted their surveillance, they followed Wheeler's car by airplane to ascertain where he stopped before going to Bush's. Wheeler led investigators to a multi-unit complex at 500 Mills Avenue, where he spent thirty minutes before continuing towards Bush's, at which point officers arrested him. The search of his car turned up 186

4

grams of 86 percent pure heroin in his glove compartment; $28,000 in cash, rubber bands, bill-wraps for thousand-dollar bills, and a loaded handgun were found at his home. At the direction of the Assistant United States Attorney ("AUSA") on the case, officers used keys seized from Wheeler to enter the Mills Avenue complex. Unsure of which unit Wheeler had accessed, police — again on the AUSA's instructions — tested the keys on various doors until they found a lock that the keys opened. Officers did a protective sweep of the apartment, pending a search warrant. After obtaining the warrant, a search revealed drug paraphernalia and a locked safe containing 761.2 grams of heroin.

During the simultaneous search of Bush's home, police discovered Bush's heroin lab, guns, drug paraphernalia, and a large amount of heroin of varying purities (that is, at different stages of the cutting or diluting process, in preparation for sale). Specifically, officers discovered 287.1 grams of 43.2 percent pure heroin, nearly 8,900 stamp bags containing 26.4 percent pure heroin, and 700 stamp bags containing 28 percent pure heroin. An officer testified that the odor of the heroin and diluents in the basement was so strong that he and other officers experienced headaches that night and the next day. Nearly a year later, in February 2013, a search of Mishra's home uncovered more than $900,000 in cash, cases of stamp bags (including gold, clear, and white bags), and drug-making paraphernalia. More stamp bags and paraphernalia were found at Rock America.

A superseding indictment was issued in March 2013 against Bush, Mishra, and Wheeler. As relevant here, Count One charged all three with conspiracy to distribute one kilogram or more of heroin from August 2011 to March 2012, in violation of 21 U.S.C.

5

§ 846. Count Three charged just Wheeler with possession with intent to distribute 100 grams of heroin, in violation of 21 U.S.C. § 841. Count Seven charged just Wheeler with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922. All three defendants pleaded not guilty, but Wheeler's trial was severed after his counsel died. On December 18, 2015, a jury convicted Bush and Mishra on all counts they faced.[1]

Wheeler's trial began in April 2016. The Government offered the testimony of the chemist who tested the drugs and the case agents involved in the investigation and arrests, and the expert testimony of Pennsylvania State Police Trooper Michael Warfield concerning illegal drug trafficking. Wheeler's defense conceded that Bush and Mishra conspired with each other, but argued that Wheeler and Bush were merely friends and that Wheeler had never met or spoken with Mishra, and so denied participation in the Bush–Mishra conspiracy. Wheeler advanced an alternative theory that the conspiracy's supplier was a Detroit-based man named Dean Floyd, with whom Bush had several conversations. The jury convicted Wheeler on all three counts, and he timely appealed.[2]

We affirmed the District Court's judgment on July 12, 2018. United States v. Wheeler, 742 F. App'x 646 (3d Cir. 2018). Approximately five months later in December 2018, Congress amended the Controlled Substances Act with the First Step

---

[1] Bush and Mishra separately appealed their convictions, which we affirmed in a non-published opinion. See United States v. Bush, 741 F. App'x 110 (3d Cir. 2018).

[2] The District Court had jurisdiction under 18 U.S.C. § 3231; this Court has jurisdiction under 28 U.S.C. § 1291.

6

Act, which Wheeler relied upon in his briefing before the Supreme Court. The Supreme Court of the United States subsequently vacated our decision and remanded with instructions to consider the effect of the newly enacted First Step Act. Wheeler v. United States, 139 S. Ct. 2664 (2019) (Mem.). We held this case curia advisari vult pending our decision in United States v. Aviles, 938 F.3d 503 (3d Cir. 2019). After the Supreme Court decided Rehaif v. United States, 139 S. Ct. 2191 (2019), we stayed this case pending our decision in United States v. Nasir, 982 F.3d 144 (3d Cir. 2020) (en banc). The Supreme Court in Greer v. United States, 141 S. Ct. 2090 (2021), concluded that an appellate court conducting plain-error review may consider the entire record, abrogating our holding in Nasir that we were limited to the trial record on plain-error review. 141 S. Ct. at 2098. Having reviewed the parties' additional briefing and requests for supplemental briefing, we address Wheeler's appeal again in light of these decisions.

## II.

We turn first to whether the First Step Act applies to Wheeler. We conclude that it does not. The First Step Act reduced the mandatory minimum sentence from twenty years to fifteen years of imprisonment for a person who was convicted of an offense under 21 U.S.C. § 841 after previously having been convicted of a serious drug felony or serious violent felony. Pub. L. No. 115-391, § 401(a)(2)(A)(i), 132 Stat. at 5220. The Act provides that its amendments "shall apply to any offense that was committed before the date of enactment of this Act, if a sentence for the offense has not been imposed as of such date of enactment." Id. § 401(c).

7

We held in Aviles, 938 F.3d at 510, that the First Step Act does not apply to cases pending on appeal at the time the Act was enacted if the district court had already entered a sentencing order. Id. The District Court sentenced Wheeler in September 2016 — over two years before the First Step Act was enacted. The Act consequently has no effect on Wheeler's sentence. Indeed, both Wheeler[3] and the Government agree that Aviles forecloses Wheeler's argument under the First Step Act.

## III.

Having concluded that the First Step Act does not apply to Wheeler, we turn next to whether Wheeler's sentence should be vacated because of the Government's failure to prove the knowledge-of-status element for Wheeler's conviction for possessing a firearm despite being a convicted felon under Rehaif. We conclude that it should not and will accordingly affirm.

As a preliminary matter, we may consider the effect of Rehaif v. United States, 139 S. Ct. 2191 (2019), on Wheeler's case because Rehaif was issued while Wheeler's case was pending on direct review, even though the Supreme Court remanded Wheeler's case to us specifically "to consider the First Step Act," Wheeler, 139 S. Ct. at 2664. See United States v. Johnson, 899 F.3d 191, 202 (3d Cir. 2018) ("The Supreme Court's order remanding this case to us does not speak to [other] issues . . ., and we will not interpret

---

[3] Wheeler concedes that Aviles is binding precedent but "maintains it was wrongly decided." Wheeler Br. in Support of Mot. to File Supplemental Brs. 4.

it as wiping away, *sub silientio*, the well-established rule of *Schriro*."); see also Schriro v. Summerlin, 542 U.S. 348, 351 (2004) ("When a decision of this Court results in a new rule, that rule applies to all criminal cases still pending on direct review." (quotation marks and citation omitted)); Griffith v. Kentucky, 479 U.S. 314, 321 n.6 (1987) ("By 'final,' we mean a case in which a judgment of conviction has been rendered, the availability of appeal exhausted, and the time for a petition for certiorari elapsed or a petition for certiorari finally denied.").

The Supreme Court in Rehaif held that, to convict a defendant under 18 U.S.C. § 922(g), the Government "must show that the defendant knew he possessed a firearm and also that he knew he had the relevant status [as, inter alia, a felon] when he possessed it." 139 S. Ct. at 2194. Wheeler did not object to the Government not showing at trial that he knew he was a felon when he possessed the firearm at issue, so we review for plain error. Nasir, 982 F.3d at 160.

Under the plain error test, the defendant must prove that there was "(1) an error; (2) that is clear or obvious; and (3) that affected [the defendant's] substantial rights." United States v. Gonzalez, 905 F.3d 165, 183 (3d Cir. 2018) (quoting United States v. Stinson, 734 F.3d 180, 184 (3d Cir. 2013)) (quotation marks omitted). When those requirements are met, "the court of appeals should exercise its discretion to correct the forfeited error if the error seriously affects the fairness, integrity or public reputation of judicial proceedings." Rosales-Mireles v. United States, 138 S. Ct. 1897, 1905 (2018) (quoting Molina-Martinez v. United States, 136 S. Ct. 1338, 1343 (2016)). We may

consider the entire record when reviewing for plain error, including the pre-sentence report. Greer, 141 S. Ct. at 2098 ("[W]hen an appellate court conducts plain-error review of a *Rehaif* instructional error, the court can examine relevant and reliable information from the entire record—including information contained in a pre-sentence report."). Showing prejudice under Rehaif "will be difficult for most convicted felons for one simple reason: Convicted felons typically know they're convicted felons." Id. (quoting United States v. Lavalais, 960 F.3d 180, 184 (5th Cir. 2020)). A stipulation that the defendant is a felon strongly supports concluding that the error did not affect the outcome of the district court's proceedings. See id. (noting that the defendant stipulated to the fact that he was a felon).

Wheeler's trial took place before the Supreme Court decided Rehaif, so the District Court did not instruct the jury that it needed to find that Wheeler knew of his status as a felon to convict him. Even assuming that the first two prongs of plain-error review are satisfied, Wheeler's claim fails at the third prong because he has not shown that the error affected the outcome of his trial. Like the defendant in Greer, Wheeler stipulated that he was a felon. The pre-sentence report likewise indicates that Wheeler was convicted of a felony and sentenced to 135 months of imprisonment. As the Supreme Court noted in Greer, "[i]f a person is a felon, he ordinarily knows he is a felon." Id. at 2097. We have no doubt, given this evidence, that Wheeler was aware of his status as a felon, and Wheeler has not alleged — nor could he plausibly allege — in

10

any of his requests for additional briefing[4] that he would have presented evidence that he did not know he was a felon when he possessed the firearm. Because the error that occurred in this case did not affect the outcome of the District Court's proceedings, we conclude that the Rehaif error does not warrant vacating Wheeler's conviction.

## IV.

Wheeler first challenges his conviction by arguing that two of the Government's principal investigators — Deputy Barrett and FBI Special Agent David Hedges — repeatedly offered opinion testimony in violation of Federal Rule of Evidence 701. After a careful review of the record, we conclude that most of the challenged statements were either (1) elicited by defense counsel on cross-examination or on re-direct in response to evidence adduced through defense counsel's cross-examination (and so cannot be raised on appeal), or (2) not objected to (and thus are reviewable for plain error). The few

---

[4]     Wheeler also requested supplemental briefing regarding United States v. Rowe, 919 F.3d 752 (3d Cir. 2019), in which the Court held that the Government must prove that the defendant distributed or possessed with the intent to distribute the charged quantity of controlled substances at a single time under 21 U.S.C. § 841. Rowe, 919 F.3d at 760. We do not require additional briefing on this matter, however, because Rowe does not extend to conspiracies. See, e.g., United States v. Williams, 974 F.3d 320, 362–66 (3d Cir. 2020) ("Where Gori held that the drug quantities involved in a single conspirator's multiple violations of § 841(a) may be aggregated for purposes of his sentence, we hold that the quantities involved in the § 841(a) violations of multiple conspirators may be aggregated for determining the mandatory minimum of any one conspirator, subject to the ordinary limitations on co-conspirator liability."); United States v. Gori, 324 F.3d 234, 237 (3d Cir. 2003) (allowing aggregation of multiple drug transactions as part of a conspiracy); see also United States v. Kendrick, 825 F. App'x 77, 78 (3d Cir. 2020).

challenged statements that remain either did not violate Rule 701 or, if they did, were harmless.

A.

We review a trial court's objected-to evidentiary rulings for abuse of discretion, United States v. Green, 617 F.3d 233, 239 (3d Cir. 2010), but review for plain error where counsel did not object during the witness's testimony, United States v. Gambino, 926 F.2d 1355, 1362–63 (3d Cir. 1991). Under our abuse of discretion review, we will overturn a trial court's evidentiary ruling only if the "decision is 'arbitrary, fanciful, or clearly unreasonable' — in short, where 'no reasonable person would adopt the district court's view.'" Green, 617 F.3d at 239 (quoting United States v. Starnes, 583 F.3d 196, 214 (3d Cir. 2009)). As discussed above, plain error review is even more exacting and requires that the error be clear or obvious and affect the appellant's substantial rights. Stinson, 734 F.3d at 184.

Rule 701 permits lay witnesses to testify concerning their opinions to the extent that those opinions are "rationally based on the witness's perception," are "helpful to clearly understanding the witness's testimony or to determining a fact in issue," and are "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. It is improper to call a lay witness for the purpose of soliciting testimony that is based on knowledge acquired from a source other than their "first-hand witness to a particular event," United States v. Fulton, 837 F.3d 281, 291 (3d Cir. 2016) (quoting United States v. Freeman, 730 F.3d 590, 597 (6th Cir. 2013)), who

12

opines concerning what conclusions to draw from the facts such that they "usurp[] the jury's role as fact finder," id., or who offers an opinion or inference that the witness is in no "better position than the jurors to form," id. 292. If such testimony is improperly admitted by the district court, the opposing party may challenge the ruling on appeal.

There are, however, exceptions to this general rule of appealability, such as that "a party introducing evidence cannot complain on appeal that the evidence was erroneously admitted." Ohler v. United States, 529 U.S. 753, 755 (2000). Such a circumstance may arise where the improper testimony is initially solicited by the party seeking to challenge the testimony (invited error), see Trouser Corp. of Am. v. Goodman & Theise, Inc., 153 F.2d 284, 287–88 (3d Cir. 1946), or in rebuttal in response to the opposing party's own solicitation of improper testimony from that same witness (opening the door), see United States v. Georgiou, 777 F.3d 125, 144 (3d Cir. 2015). In either circumstance, the party who elicited the improper testimony cannot on appeal challenge its admissibility.

B.

The majority of the alleged Rule 701 violations in this case are unappealable because they were either adduced by defense counsel or properly elicited by the Government in response to testimony adduced by defense counsel. On reply and at argument, Wheeler did not contest these principles, but insisted that defense counsel's questioning was required to "deal with the [trial] court's adverse, faulty rulings" which had excluded much of the evidence that defense counsel elicited via cross-examination of the Government's witnesses, and so should not be understood as opening the door to the

13

proffered testimony. Reply Br. 6. To the extent that this position has any legal support, Wheeler has not presented it. But even if he did, his argument fails because it is predicated on his claim that defense counsel was forced into eliciting these statements by the District Court's "faulty rulings," rulings which Wheeler does not challenge on appeal.

Accordingly, we conclude that Wheeler cannot on appeal challenge the following statements: (1) Barrett's opinion, on cross-examination and clarified on re-direct, that based on "the investigation," Bush was buying diluent from Mishra for himself to cut drugs, rather than to resell the diluent, Appendix ("App.") 564–65, 594; (2) Barrett's opinion, on re-direct in response to specific questioning by defense counsel, that Floyd was not Bush's supplier and that Bush had lied to Floyd on one of the calls; (3) Barrett's testimony, on re-direct after defense counsel explicitly asked for his opinion, that he believed that Wheeler was the supplier rather than Floyd; and (4) Hedges' testimony on cross-examination that investigators never intercepted Floyd's calls because they lacked evidence that could have supported a wiretap.

## C.

Defense counsel failed to object to two of the five remaining challenged statements, so we review their admission for plain error.

The first is Hedges' narrative concluding that Floyd was not the supplier, in essence because he was not Wheeler. We agree that Hedges' testimony that Wheeler was "the supplier of the heroin to Mr. Richard Bush," App. 891, is an opinion concerning the ultimate issue that "merely tells the jury what result to reach" based on evidence just as

14

much before the jury and is accordingly improper, <u>Fulton</u>, 837 F.3d at 291 (quoting

<u>United States v. Stadtmauer</u>, 620 F.3d 238, 262 (3d Cir. 2010)). Nevertheless, its

admission was not plainly erroneous because even if the error were clear or obvious —

and there is reason to think it was not, <u>see</u> <u>United States v. Jackson</u>, 849 F.3d 540, 555

(3d Cir. 2017) (holding opinion testimony that was improper under <u>Fulton</u> not plainly

erroneous when offered, as here, in a trial predating <u>Fulton</u>) — Wheeler has not shown

that the statement prejudiced him. First, the testimony is very similar to what Barrett said

on re-direct, discussed above, which Wheeler cannot challenge. Because substantially

the same statement was permissibly before the jury, Wheeler cannot show that Hedges'

additional statement affected the outcome of the trial. <u>Cf.</u> <u>United States v. Salli</u>, 115 F.2d

292, 294 (2d Cir. 1940) (concluding that improper testimony did not require mistrial

where it "added very little to what was already in evidence"). Moreover, defense counsel

effectively relied upon the statement in summation as proof that Barrett and Hedges were

untrustworthy and biased witnesses. Where defense counsel used the testimony in

support of Wheeler's case, he can hardly complain that it also prejudiced him.

The second statement is Hedges' description of 500 Mills Avenue as Wheeler's

"second location," App. 898, which Wheeler argues was an assertion that the Mills

Avenue apartment was Wheeler's stash house. This interpretation is belied by the record,

however, which makes clear that the statement was a factual description that the drugs

were found at the second place that Wheeler went to on the day he was arrested. Because

it was not an opinion — let alone clearly so — that it was Wheeler's stash house, the District Court did not clearly err by failing to <u>sua</u> <u>sponte</u> preclude this testimony.

D.

Finally, Wheeler challenges the admission of three statements to which he contemporaneously objected and has not waived his right to appeal.

Barrett made the first two statements when describing how the officers prepared to execute the arrests on March 14. Barrett detailed how the investigators reached their conclusion that Wheeler was stopping somewhere before going to Bush's house, and explained that they followed Wheeler by airplane because they had determined he was "very surveillance conscious." App. 683–84, 686. Wheeler argues again that this explanation implied that the Mills Avenue apartment was Wheeler's stash house and that Barrett's comment about surveillance was based on a mistake of fact, namely the incorrect belief that Wheeler discarded his phone after spotting police surveillance. We conclude that neither statement violated Rule 701.

Barrett never testified that the Mills Avenue apartment was a stash house. Rather, his statement was made to explain why the agents set up their arrest plan the way they did, based around their assumption that Wheeler "was stopping somewhere" and their desire "to figure out where." App. 686. He did not opine about why the trip took so long or the nature of Wheeler's relationship to the place where he stopped, and so did not run afoul of Rule 701's limitations on lay opinion testimony. Regarding the surveillance comment, as Wheeler's brief concedes, the basis for Barrett's statement was not the

16

belief that Wheeler discarded his phone, but that immediately after the police thought that Wheeler had spotted them, Wheeler called Bush saying that something "[w]eird as hell" was going on and "somebody was watching or something." Supp. App. 26. Barrett's role as the agent listening to wiretaps means that he had personal awareness of that call, which informed how he, as one of the lead agents, structured the arrests. This testimony, which showed Barrett's state of mind based on observing Wheeler's phone call and that "informed the jury of [his] attentiveness and cautiousness in approaching" the arrest, was not an opinion and was admissible under Rule 701. United States v. Christian, 673 F.3d 702, 709 (7th Cir. 2012).

Wheeler's final Rule 701 challenge concerns Barrett's testimony that, in a key call between Bush and Wheeler, "joints" referred to empty stamp bags. Barrett agreed that "joints" had no fixed meaning and that he had no personal knowledge derived from this particular investigation to support his interpretation of "joints" in the call. Indeed, in concluding that "joints" meant stamp bags, Barrett explained that "from the context of this conversation, when he's talking about colors, I interpret it to mean sleeves or the stamp bags," App. 629–30, highlighting that he reached this conclusion not based on any personal familiarity with the way that Bush and Wheeler had used the word "joints," but based on the context of the call that was equally apparent to the jurors. Accordingly, Barrett's testimony fails Rule 701's helpfulness requirement because he had no special insight to offer and was "no better suited than the jury to make the judgment at issue." Fulton, 837 F.3d at 293 (quoting United States v. Meises, 645 F.3d 5, 16 (1st Cir. 2011)).

17

Because the "'value' of [Barrett's] testimony regarding the phone [calls] was to 'tell the jury what result to reach,'" the testimony is inadmissible under Rule 701. Id. at 293–94 (quoting United States v. Garcia, 413 F.3d 201, 210 (2d Cir. 2005)).

Nevertheless, the testimony was harmless. An erroneous "evidentiary ruling is harmless error when 'it is highly probable that the error did not affect the result.'" United States v. Friedman, 658 F.3d 342, 352 (3d Cir. 2011) (quoting Hill v. Laeisz, 435 F.3d 404, 420 (3d Cir. 2006)). Just as the context of the call allowed Barrett to infer that "joints" referred to stamp bags, so too would the context all but certainly lead the jury to that conclusion. In the "joints" call, Wheeler asks Bush what color "joints" to buy, and Bush replies that he should buy gold or white ones. In response to Wheeler's concern that those colors might not be in stock, Bush says to buy brown joints, which Wheeler confirms are "[l]ike the ones you got." Supp. App. 25. Viewed in connection with a conversation, also before the jury, in which Bush discusses ordering white and gold stamp bags from Mishra, as well as the fact that Mishra was found in 2013 to have stamp bags matching those colors, it is almost inescapable that Bush and Wheeler were in fact discussing the purchase of stamp bags. Indeed, the obviousness of the call's subject was the core of the Government's contention in summation. Ridiculing the defense's argument that "'joints' could mean a gun, 'joints' could mean a basketball game, 'joints' could mean a place," the Government asked rhetorically whether the call was discussing "a gold gun," "gold basketball game, or "gold place? No." App. 1222. Although Barrett was in no better position than the jury to interpret the call, even without his intervention,

18

"the jury on its own could review the calls that [Barrett] wrongfully interpreted to reach its own conclusion as to their meaning in light of" the prior calls discussing colored stamp bags, the colored stamp bags at Mishra's, and the call's obvious context. Jackson, 849 F.3d at 555. That independent review would have led the jury to the same conclusion that Barrett reached, so his improper testimony did not affect the result and was harmless.

V.

Wheeler next challenges the testimony of the Government's expert on the drug trade — Trooper Warfield — concerning (1) his view of the meaning of "joints" in the above-discussed call, (2) his opinion that the call indicated that Bush and Wheeler "are working together," and (3) his interpreting ambiguous phrases in communications between Wheeler and Bush that were not drug code. In this Circuit, "[b]ecause the primary purpose of coded drug language is to conceal the meaning of the conversation from outsiders through deliberate obscurity, drug traffickers' jargon is a specialized body of knowledge and thus an appropriate subject for expert testimony." United States v. Gibbs, 190 F.3d 188, 211 (3d Cir. 1999). We review the District Court's decision to allow expert testimony concerning a given subject for abuse of discretion. Id. As discussed below, although we conclude that Warfield exceeded the scope of his expertise when interpreting vague, rather than coded language, the error was harmless.

Warfield explained that "joints" usually means bricks of heroin, but that in the "context of the call" and the stamp bags seized from Mishra, joints means stamp bags.

App. 1048–49.  To the extent that this statement precludes finding that "joints" was a code word, the error is harmless as explained above.  But see Gibbs, 190 F.3d at 211 ("It was within the scope of [the agent's] expertise to explain . . . in specific contexts . . . that to 'hit' someone meant to page them on a beeper, that 'on post' meant 'ready and waiting . . . .'" (emphasis added)).

As to Warfield's interpretation that Bush and Wheeler were "working together," based on the fact that Bush told Wheeler to buy the same color stamp bags as he had, defense counsel did not object, so we review for plain error.  App. 1049.  Given Warfield's admission as an expert in the field of illegal drug trafficking, and his explanation that drug traffickers want their stamp bags to be "unique" and "different from everyone else" so that their drugs are not confused with a competitor's, App. 1033, it was within the scope of his expertise to opine that where a drug trafficker does not care that someone else is using the same bag as he is, it indicates that they are not competitors.  Although in Gibbs we noted concern regarding an agent's theoretical testimony that "in light of the meanings he has attributed to certain conversations, a defendant has played a certain role in . . . a conspiracy," we noted that so long as the expert "has not explicitly testified about a defendant's intent, courts have been reluctant to exclude the expert's testimony."  190 F.3d at 212.  Here, Warfield never explicitly opined that by "working together" Wheeler had evidenced the intent necessary to join the charged Bush–Mishra conspiracy.  That Bush and Wheeler were working together is just as consistent with finding a buyer–seller relationship, a separate conspiracy, or a mere friendship.  The

20

opinion did not impermissibly reach the question of the purpose of that collaboration, which was left for the jury to decide. In any event, if Warfield's testimony strayed somewhat beyond that line, the error was not plain or obvious.

Warfield did, however, exceed the scope of his expertise by interpreting messages between Wheeler and Bush that were simply vague, rather than coded, and which could just as well have referred to legal activities. Interpreting Wheeler's text to Bush that he was "takin a trip," and that Bush should "hold it down" and "be safe," Warfield explained that based on his "experience and listening to thousands of calls over Title III wiretaps," "takin a trip" could have various meanings: it "could mean taking a trip or it could mean I'm going to re-up . . . [m]ean[ing] going to obtain additional quantity of whatever drug you're selling." App. 1043–44. Warfield went on to explain that "hold it down" meant "handle your business until I get back, meaning continue to sell until I get back," and that "be safe" meant "don't get caught." App. 1044.

In Gibbs, we held that expert testimony "is relatively uncontroversial when it permits a government agent to explain the actual meanings of coded words," but that such testimony concerning (potentially) drug-related meanings of phrases like "tonight is the night" and "got to do it tonight" was improper because, "[u]nlike a word like 'jawn,' which would not be familiar to most jurors," those phrases "contain[] no intrinsic code that a jury would be unable to understand." 190 F.3d at 211–12. We concluded that "[i]t was the function of the jury, which heard all of the relevant tape recordings, to determine what these phrases meant in the context of the surrounding sentences." Id. at 213.

21

Because, like in Gibbs, "the only purpose of [Warfield's] testimony was to bolster the government's allegations" that Wheeler was Bush's drug supplier, id., the District Court abused its discretion by failing to exclude the testimony concerning the meaning of "hold it down" and "be safe," which are phrases that are not beyond the ken of a reasonable juror. Cf. Jackson, 849 F.3d at 554 (concluding that phrases like "you can go ahead and send him" were clear and so a witness's drug-related explanation "provided unhelpful argument in the guise of evidence"). We now once again stress that trial courts must be vigilant to the danger that when an expert purports to interpret vague language that may not be coded, they are prone to offering an explanation that falls within the subject matter of their expertise, regardless of whether the conversation's participants meant the words to bear that meaning. An expert brought to interpret drug code might give a drug-related meaning to every phrase he or she interprets, thereby circularly interpreting all the exchanges as drug-related merely by virtue of their appearance in a drug trial. On the other hand, regarding "taking a trip," because Warfield clearly explained that it could have an innocuous meaning, he did not usurp the jury's function and the District Court did not abuse its discretion by permitting the testimony.

The District Court's error in permitting Warfield to testify regarding the meaning of "hold it down" and "stay safe" was, however, harmless. First, defense counsel effectively cross-examined Warfield about his statements, and elicited his agreement that "taking a trip," "hold it down," and "be safe" could just as well carry no illicit meaning at all. See Fuentes v. Reilly, 590 F.2d 509, 511 (3d Cir. 1979) (identifying no reversible

22

error as to expert's improper testimony where he "was cross-examined at length" and his testimony was rebutted). Second, the Government never repeated Warfield's improper interpretations of "hold it down" or "be safe." Rather, the Government reiterated that Warfield had testified that the message "could mean several things; but one thing it could mean in the context of a drug distribution conspiracy is that he's going down to re-up." App. 1158. The Government did not add that Wheeler was telling Bush to continue selling drugs or not to get caught; the information it did convey was that Warfield had offered a possible explanation for the phrase and that the jury was charged with deciding which interpretation was right. See, e.g., United States v. Cafaro, 455 F.2d 323, 327 (2d Cir. 1972) (concluding that improper testimony that "was not referred to in any later testimony and was not mentioned in the prosecutor's summation, was harmless error"). Third, the District Court instructed the jury that Warfield's testimony "should receive whatever weight you think appropriate given all of the other evidence in the case," App. 1008. Cf. United States v. Dowling, 855 F.2d 114, 124 (3d Cir. 1988) (holding improper prior bad acts testimony harmless where court instructed the jury on testimony's limited value, the prosecutor noted its limited purpose, and the defense stressed defendant was acquitted).

Considering Warfield's assertion that the text message could have carried a non-illegal meaning — a view reiterated by both the Government and defense in summation — his improper testimony would merely have provided the jury with a potential interpretation, which they then could assess, per the court's instructions, in light of the

23

other evidence in the case. That evidence included testimony that Wheeler had no job and no obvious income to support a pleasure-trip to Florida (a heroin gateway); that he had discussed buying stamp bags for Bush; and that he spent hours at a time in Bush's heroin lab, which he could access with his own remote to Bush's garage. Rational jurors would thus very likely conclude on their own that the discussion was drug-related, and Warfield's testimony would not have overcome their independent analysis or judgment.

## VI.

Wheeler next argues that the evidence presented at trial was insufficient to support his conviction, which he asserts was based on inferences not supported by the evidence, or at least insufficient to support the finding that the charged conspiracy involved a kilogram or more of heroin. We disagree.

In considering challenges to the sufficiency of the evidence we "review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt[] beyond a reasonable doubt." United States v. Caraballo-Rodriguez, 726 F.3d 418, 430 (3d Cir. 2013) (en banc) (quoting United States v. Brodie, 403 F.3d 123, 133 (3d Cir. 2005)). Reflecting on the totality of the evidence, we "ask whether it is strong enough for a rational trier of fact to find guilt beyond a reasonable doubt." Id. (quoting United States v. Boria, 592 F.3d 476, 480 (3d Cir. 2010)).

To prove the existence of a conspiracy, the Government must establish beyond a reasonable doubt that the conspirators shared a unity of purpose, intended to achieve a common illegal goal, and agreed to work toward that goal. Id. at 425. Because

24

conspiracies, by their very nature, are secretive, the prosecution can make its case based entirely on circumstantial evidence: "A case can be built against the defendant grain-by-grain until the scale finally tips." Id. at 431 (quoting United States v. Iafelice, 978 F.2d 92, 98 (3d Cir. 1992)). So long as reasonable inferences of guilt bearing a "logical or convincing connection to established fact" may be derived therefrom, id. at 426 (quoting United States v. Cartwright, 359 F.3d 281, 291 (3d Cir. 2004)), it is irrelevant whether the evidence is categorized as "direct" or "circumstantial," id. at 431. Where such inferences may be drawn, a reviewing court may not "[r]evers[e] the jury's conclusion simply because another inference is possible — or even equally plausible" because on review for sufficiency of the evidence "[t]he evidence does not need to be inconsistent with every conclusion save that of guilt if it does establish a case from which the jury can find the defendant guilty beyond a reasonable doubt." Id. at 432 (quoting United States v. Cooper, 567 F.2d 252, 254 (3d Cir. 1977)).

A.

Wheeler argues that the Government's case was wanting because, despite hours of wiretaps and video surveillance, the Government failed to present any direct evidence of Wheeler's participation in the charged conspiracy, and that the circumstantial evidence could not support such an inference. Wheeler challenges the inferences derived from (1) the heroin in his car, (2) the "joints" call, and (3) the drugs at Mills Avenue.

25

The Government argued at trial that the pure heroin found in Wheeler's car showed that Wheeler was Bush's supplier because heroin of that purity would not be sold on the street, but rather would be diluted twice to a purity of around 24 percent. The heroin found in Bush's basement were variously at purities of 43 percent (having been diluted once) and 26 to 28 percent (diluted twice). The evidence thus suggested Wheeler was supplying the pure heroin (which had to be procured from outside of Pittsburgh) to Bush for distribution. Wheeler argues that this inference was undermined by the fact that the heroin in his car contained mannitol, whereas the cut heroin in Bush's basement did not, and that Bush was recorded asserting that he would not use mannitol as a diluent because it would "f*** . . . up" his heroin recipe. Supp. App. 69.

The evidentiary support for Wheeler's claim — and for the Government's retort that the drugs in Bush's basement did, in fact, contain mannitol — is somewhat complex. The Government at trial presented the testimony of Tara Rossy, a forensic chemist with the DEA, who reviewed the various tests she performed on the seized drugs. As the Government clarified at oral argument, the prosecutor questioning Rossy relied as a roadmap on exhibit DEA 21, a summary chart prepared for the prior Bush–Mishra trial, which aggregated the results of all the drugs tested, but which — because it was not at issue in that trial — did not indicate that any of the drugs found in Bush's basement contained mannitol. Accordingly, when the prosecutor walked Rossy through the different tests she performed, he failed to elicit that mannitol had been detected in the

26

samples. At the end of Rossy's testimony, the prosecutor attempted to publish DEA 21, at which point he noticed his error and retracted it in favor of DEA 21A, which he asserted was the corrected and complete chart. Unlike DEA 21, DEA 21A did list mannitol as present in each of the samples found in Bush's basement. Wheeler objected to the admission of DEA 21A because it did not reflect Rossy's testimony. In response to further questioning, however, Rossy reviewed DEA 21A and testified that it accurately reflected her testimony, and so the District Court admitted the chart as evidence, noting that Wheeler could cross-examine Rossy to dispute the chart's accuracy. Wheeler, however, did not do so and does not challenge the admission of the chart as violating Federal Rule of Evidence 1006. Thus, to the extent that the chart was improperly admitted, the question is not properly before us, and in any event, Wheeler's failure to cross-examine Rossy deprives us of the ability to question whether the chart was indeed an accurate reflection of her lab tests.

Wheeler asserts that because the District Court instructed the jury that "[t]he charts and/or summaries are not themselves evidence or proof of any facts" and that if they "do not correctly reflect the evidence in the case, you should disregard them and determine the facts from the underlying evidence," App. 1123, the jury could not have relied on the inclusion of mannitol in the chart where it was not established by Rossy's testimony. However, given that Rossy explicitly adopted the summary as reflecting her testimony and Wheeler failed to expose any inconsistency through cross-examination, a reasonable jury could have accepted DEA 21A at face value. See United States v. Radtke, 799 F.2d

27

298, 305 (7th Cir. 1986) (concluding that defendant "in effect conceded the accuracy of the information on [the exhibit] as he never questioned [the witnesses] concerning the accuracy of the information thereon"). Accordingly, the jury could reasonably have relied on the contents of DEA 21A to reach the conclusion that all the heroin in Bush's basement did, in fact, contain mannitol. Although, in light of Rossy's testimony, they perhaps could have reached another conclusion, we cannot entertain "hypothetical[]" considerations of what might have occurred had we been "ourselves in[] the jury room for deliberations." Caraballo-Rodriguez, 726 F.3d at 432. In the light most favorable to the Government, the jury could reasonably have concluded — given his presence in Bush's drug lab and video of him bringing bags inside — that Wheeler was bringing pure heroin to Bush to dilute for resale. Indeed, if the jury accepted DEA 21A, then Bush's refusal to use mannitol works sharply against Wheeler, because the only explanation for the presence of mannitol in Bush's drugs would be that the pure heroin Bush was diluting already contained mannitol. As noted, the relatively pure heroin found in Wheeler's car contained mannitol.

2.

Wheeler's next contention is that because no brown stamp bags were found in Bush's home during the March 14, 2012 search, it would be unreasonable to infer, based on the January 25, 2012 call during which Wheeler seemed to know that Bush was using brown "joints," that Wheeler was aware of Bush's operation and thus that they were working together. Moreover, he asserts that if "joints" means stamp bags, then the fact

28

that Wheeler was purchasing stamp bags from someone other than Mishra shows that Bush did not trust Wheeler with his source of paraphernalia.

Again, Wheeler simply points to a possible reasonable inference that the jury might have drawn from the evidence, but does not show that the evidence compels that inference or renders implausible the opposite inference. A reasonable jury could have concluded that in the month and a half between the January call and the March search, Bush used up the brown stamp bags that he had. Indeed, his shortage of stamp bags would be why Wheeler was purchasing more. Moreover, the evidence shows that during Bush's December 5, 2011 call with Mishra, Mishra indicated that he was low on stamp bag inventory and was simultaneously trying to reduce his inventory because of pressure from police. It would thus be consistent with the evidence for the jury to conclude that Bush was using up his brown stamp bags; could not at the time of his January call with Wheeler (less than two months after his conversation with Mishra) acquire more bags from Mishra; and did not thereafter buy more brown bags, but instead got more gold or white bags. Thus, that Wheeler was not going to Mishra would not be indicative of a lack of trust, but instead of Wheeler's knowledge that Mishra was low on stamp bags.

In conjunction with the evidence showing the Bush trusted Wheeler enough to (1) give him a remote control to his garage (and thereby unimpeded access to his drug lab); (2) allow him to stay unsupervised in his drug lab (which was small, filled with paraphernalia, and smelled strongly of chemicals, thereby making it all but impossible that Wheeler would be unaware of the room's purpose); (3) allow him to purchase the

29

same color stamp bags as he had, in contrast to his eruption when he thought Mishra had sold the same bags to a rival dealer; and (4) call him the "most important n***a in [his] life," a reasonable jury could infer Wheeler's participation with Bush in a drug conspiracy. At the very least, a reasonable jury could not conclude merely from Wheeler's purchase of stamp bags from someone other than Mishra that there was a lack of trust undercutting an inference that Wheeler and Bush were in a conspiracy.

3.

Wheeler's final argument regarding sufficiency is that the Government's claim that the Mills Avenue apartment was Wheeler's "stash house" where the drugs found in his car came from, is an unreasonable inference unsupported by the evidence, given that he was only seen at the apartment once during the surveillance period. We need not delve too deeply into this issue, because Wheeler has failed to explain how this argument casts any doubt on his conviction. Although presumably, the jury might have concluded based on Wheeler's access to the drugs at Mills Avenue that he was involved in the drug trade, this inference is just as — if not more — strongly raised by the exceedingly pure heroin found in his car and the other evidence discussed above. It is highly unlikely that the evidence from Mills Avenue swayed the jury in deciding the basic question of whether Wheeler was even a participant in the conspiracy.

Wheeler more deliberately argues this point as part of his alternative argument that the evidence did not support finding that the conspiracy involved one kilogram or more of heroin. He contends that because there was no evidence that he had control of the

Mills Avenue drugs, those quantities of drugs could not be counted as part of the conspiracy total, and without the heroin found at Mills Avenue, the heroin in Bush's basement and Wheeler's car did not add up to one kilogram. Again, whatever merit there is to this claim, we need not dwell on it, because even excluding the Mills Avenue drugs, there was ample evidence before the jury to conclude that the conspiracy involved one kilogram or more of heroin.

The jury saw evidence that roughly every month Bush ordered two boxes of stamp bags from Mishra and that such a quantity of stamp bags would hold 1.5 kilograms of heroin. Accordingly, the jury could have reasonably concluded based only on this evidence that Bush was selling around 1.5 kilograms of heroin per month. The Government may "prove the guilt of one defendant through the acts of another committed within the scope of and in furtherance of a conspiracy of which the defendant was a member, provided the acts are reasonably foreseeable as a necessary or natural consequence of the conspiracy." United States v. Lopez, 271 F.3d 472, 480 (3d Cir. 2001). The jury was appropriately instructed concerning this standard. The jury could have reasonably concluded that Wheeler was a member of the conspiracy for a few months, at least, and thus that even excluding the Mills Avenue drugs, Wheeler was involved in a conspiracy that foreseeably distributed one kilogram or more of heroin.

VII.

Wheeler next argues that under the trespass theory of the Fourth Amendment articulated in United States v. Jones, 565 U.S. 400 (2012) and Florida v. Jardines, 569

31

U.S. 1 (2013), the officers' use of a key seized from Wheeler first to enter the apartment complex at 500 Mills Avenue and then to ascertain which apartment Wheeler had access to by testing the key in each apartment's lock, constituted warrantless searches that were per se unreasonable, requiring the suppression of the evidence resulting therefrom. We conclude that Wheeler has waived the Jones–Jardines theory by failing to raise it at trial and that to the extent he presses a claim based on the reasonable expectation of privacy principles announced in Katz v. United States, 389 U.S. 347 (1967), his argument fails.

A.

In this Circuit, "suppression issues raised for the first time on appeal are waived absent good cause under Rule of Criminal Procedure 12," and Rule 52's plain error rule does not apply. United States v. Rose, 538 F.3d 175, 177 (3d Cir. 2008). Merely "raising an issue in the District Court is insufficient to preserve for appeal all arguments bearing on that issue. Instead, to preserve a suppression argument, a party must make the same argument in the District Court that he makes on appeal." United States v. Joseph, 730 F.3d 336, 341 (3d Cir. 2013). As applied here, Wheeler asserted before the District Court that the key-insertion was a search in violation of the Fourth Amendment, but did not articulate a more specific theory within the Fourth Amendment. At the hearing, defense counsel accepted as controlling the discussion of Wheeler's reasonable expectation of privacy in the lock. At no point — in Wheeler's motion, at the hearing, or in his motion for reconsideration — was a trespass theory raised. Wheeler contends that the trespass theory was not waived because he broadly argued that the key-insertion violated the

32

Fourth Amendment.  But as explained, such a general legal conclusion is not tantamount to preserving the specific legal theory in support of the conclusion.  Having failed to raise the trespass theory, it is forfeited.  See Rose, 538 F.3d 183.

Wheeler has not articulated good cause for his failure to raise this claim before the District Court.  His sole explanation is that it was the Government who provided the District Court with the Katz line of case law, which Wheeler asserts is outdated.  However, Wheeler cannot establish good cause based on the District Court's reliance upon the Government's theory, where Wheeler failed to present any authority to the District Court in support of his suppression argument and then failed to apprise the District Court of the trespass theory either at argument or upon his motion for reconsideration.

B.

In a terse footnote, Wheeler asserts that the case could be resolved under reasonable expectation of privacy principles.  Wheeler Br. 71 n.19.  As a general matter, "we have consistently refused to consider ill-developed arguments or those not properly raised and discussed in the appellate briefing."  Barna v. Bd. of Sch. Dirs., 877 F.3d 136, 145 (3d Cir. 2017); see also John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp., 119 F.3d 1070, 1076 n.6 (3d Cir. 1997) (explaining that "arguments raised in passing (such as, in a footnote), but not squarely argued, are considered [forfeited]").  But treated on the merits, the claim is unavailing.  This Court has explicitly held that "a resident lacks an objectively reasonable expectation of privacy in the common areas of a multi-unit

33

apartment building with a locked exterior door." United States v. Correa, 653 F.3d 187, 190–91 (3d Cir. 2011).  Wheeler makes no attempt to reckon with this precedent. Concerning the key-insertion, Wheeler's citation to Justice Kagan's concurrence in Jardines, which asserts that that case (which involved a dog sniff on the defendant's front porch) could have been resolved on the basis of Jardines' reasonable expectations of privacy, sheds no light on whether an individual has any reasonable expectation of privacy to the fact that a key works with his home's lock.  Moreover, our sister Courts of Appeals who have addressed the issue under the reasonable expectation of privacy theory have concluded that inserting a key into a lock is either not a search at all, or else so minimal an invasion of privacy that a warrant is not needed.  See, e.g., United States v. Thompson, 842 F.3d 1002, 1008 (7th Cir. 2016); United States v. Moses, 540 F.3d 263, 272 (4th Cir. 2008); United States v. Salgado, 250 F.3d 438, 456–57 (6th Cir. 2001); United States v. Lyons, 898 F.2d 210, 212–13 (1st Cir. 1990); United States v. $109,179 in U.S. Currency, 228 F.3d 1080, 1087–88 (9th Cir. 2000).  Again, Wheeler makes no argument concerning why those cases were wrongly decided under a reasonable expectation of privacy theory, so cannot prevail on this claim.

## VIII.

Wheeler next argues that the evidence presented at trial raised the inference that there were multiple conspiracies and that the District Court erred by refusing to instruct the jury that they must find that Wheeler was a member of the charged conspiracy as opposed to some other conspiracy.  We disagree.

34

The evidence that Wheeler asserts could have formed the basis of a multiple-conspiracies instruction related to whether Mishra was involved in a conspiracy to sell paraphernalia apart from his conspiracy with Bush to sell heroin. A district court may refuse to instruct on multiple conspiracies if "there is insufficient evidence to support such an instruction." United States v. Greenidge, 495 F.3d 85, 93 (3d Cir. 2007). And "'even if a multiple conspiracies charge should have been given, reversal on appeal is <u>not</u> automatic.' The convictions cannot be vacated unless appellants show 'both the likelihood of multiple conspiracies having existed, and substantial prejudice resulting from the failure to give the requested charge.'" Id. at 95 (citation omitted) (quoting United States v. Barr, 963 F.2d 641, 650 (3d Cir. 1992)).

As the District Court noted, there was simply no evidence before the jury of multiple conspiracies. Wheeler relies on the fact that the Government in a separate trial charged Mishra with a conspiracy to sell drug paraphernalia, and on defense counsel's argument at trial that the evidence could have supported the view that Bush was reselling stamp bags purchased from Mishra for profit, rather than using them in his heroin distribution business, such that there was a separate Bush–Mishra paraphernalia conspiracy. But no witnesses in Wheeler's trial agreed that there was a separate paraphernalia conspiracy and the jury was never made aware that Mishra was later charged with this separate conspiracy. See United States v. Curran, 20 F.3d 560, 572 (3d Cir. 1994) ("The determination of whether an instruction on single or multiple conspiracies must be submitted to the jury rests on the facts developed during the trial.").

35

The jury could not have erroneously found Wheeler to be a member of the heroin conspiracy on the basis of his interaction with paraphernalia — conduct the jury did not know was illegal.

In any event, the hypothetical existence of a separate paraphernalia conspiracy, even if supported by the record, would not have permitted the jury improperly to convict Wheeler of conspiracy to distribute one kilogram of heroin as opposed to some lower quantity, because that paraphernalia conspiracy would have involved no additional heroin to aggregate with the heroin involved in the charged conspiracy. Accordingly, to the extent that the paraphernalia sales were the object of a separate conspiracy involving Bush and Mishra — a conspiracy that Wheeler either was not involved in or which had a separate object from the heroin conspiracy — there is no prejudice (much less, substantial prejudice) in combining them together into a single conspiracy, given that any evidence regarding paraphernalia had no impact on Wheeler's conviction.

## IX.

Wheeler objects that the District Court abused its discretion by allowing the Government to present as evidence the stamp bags, diluents, cash, and other drug paraphernalia that were seized from Mishra's home in February 2013, nearly a year after Bush and Wheeler's arrests ended the charged conspiracy. Because Mishra was alleged to have sold drug materials to multiple individuals, Wheeler argues that the after-discovered evidence was not relevant to prove that Mishra was involved in a conspiracy with Bush or Wheeler from a year earlier, and moreover that the admission of the

36

evidence violated Federal Rule of Evidence 403 because its prejudicial value far outweighed its probative value. Although the admission of cash found at Mishra's home presents a closer issue, we conclude that the District Court did not abuse its discretion.

Under Federal Rule of Evidence 401, "[e]vidence is relevant if . . . it has any tendency to make a fact more or less probable than it would be without the evidence." The standard is "not high." Carter v. Hewitt, 617 F.2d 961, 966 (3d Cir. 1980). Evidence is not irrelevant merely because it arises post-conspiracy, particularly when the evidence sheds light on a defendant's intent. See Lutwak v. United States, 344 U.S. 604, 617 (1953). Where the evidence may "giv[e] rise to reasonable inferences of fact" which are central to the determination of the case, there is "no bright line rule for determining when evidence is too remote to be relevant." Ansell v. Green Acres Contracting Co., 347 F.3d 515, 525 (3d Cir. 2003). Such evidence is properly admitted and "[t]he passage of time and purportedly changed circumstances [are] proper issues for counsel to argue to the jury, and for the jury to consider in weighing the evidence." Id.

Concerning the stamp bags, the "joints" call was one of the central pieces of evidence in the Government's case, and the fact that Mishra was found in 2013 to have stamp bags matching the colors discussed on the call makes it more probable that Bush and Wheeler were in fact discussing the purchase of stamp bags. Along with Wheeler's knowledge of the kind of stamp bags that Bush was at the time using, this evidence gives rise to the inference that Bush and Wheeler were engaged in a conspiracy to distribute drugs, and so is relevant. Wheeler's challenge that the time-lapse renders the evidence

37

irrelevant is unpersuasive. The evidentiary import of the stamp bags is not limited to the possibility that these were the bags ordered by Bush — although the jury was free to reach that conclusion — because it substantiates the Government's argument that gold and white "joints" in the call refer to stamp bags, which shows that Wheeler was engaged in drug-related activities with Bush and had the requisite intent to join the Bush–Mishra conspiracy. See Lutwak, 344 U.S. at 617. That the bags might have been purchased after the close of the conspiracy or for other clients does not undercut their probative value.

The diluents and drug paraphernalia were likewise relevant to the Government's case, which asserted that Wheeler was the person who provided the money to Bush to make his purchases from Mishra and who warned Bush that Mishra's store was under surveillance. If the jury believed that Wheeler was that person, the fact that Wheeler may never have met Mishra is irrelevant because he would have been aware of, and interested in, Mishra's role in the conspiracy. See United States v. Castro, 776 F.2d 1118, 1124 n.4 (3d Cir. 1985) (recognizing a conspiracy where members do "not have any direct relations with one another" where they are "aware of one another and have done something in furtherance of a single, illegal enterprise"). The items seized from Mishra would show that Mishra was indeed trafficking in the diluents that Bush and Mishra spoke about on the phone and that Mishra was in possession of the same types of drug paraphernalia found in Bush's lab, which is probative of Mishra's involvement in a drug conspiracy. Although, like the stamp bags, it is possible that these were not items earmarked for Bush, it still makes it more likely that the Bush–Mishra discussions were

38

related to the carrying out of a drug conspiracy, in which Wheeler was allegedly a participant. Establishing the existence of the Bush–Mishra conspiracy was important to the case against Wheeler, because "certain types of circumstantial evidence become substantially more probative if it can be established that a conspiracy existed and the only remaining question is whether the defendant was a part of it." United States v. Pressler, 256 F.3d 144, 151 (3d Cir. 2001). Thus, by showing that an object of the Wheeler–Bush relationship was Bush's illegal trade with Mishra, an inference was raised that Wheeler was a member of that conspiracy to distribute heroin. As the District Court noted, it was up to the jury to decide what weight to give to the after-discovered evidence and to determine whether the seized evidence could be "reasonably connected to" the charged conspiracy involving Wheeler that "terminated in 2012." App. 324.

The cash poses a more difficult issue. Mishra was found with nearly one million dollars in cash upon his arrest. Wheeler argues that this was not relevant to the charged conspiracy, given that nearly a year had elapsed, during which period Mishra was still in the drug trade. We disagree with the Government's contention that the existence vel non of the cash is relevant to Mishra's stake in the charged conspiracy, as it is untethered from any particular sales. Nevertheless, the amount of cash was relevant to show that, at least at the time of his arrest, Mishra was profitably involved in the drug trade, making it more probable that he was also engaged in the drug trade with Bush a few months earlier.

Although we recognize the possibility that after seeing so much cash, a juror might conclude that Mishra was involved in some wrongdoing and therefore — based on the

39

image alone — that Wheeler was, too, our sister courts have concluded on similar facts that "the sight of cash itself (unlike, for example, the sight of a victim of a gruesome murder) is an everyday occurrence" that would not prejudice jurors against the defendant, especially given the large amounts of cash inherent in the drug sales discussed at trial. United States v. Davis, 838 F.2d 909, 921–22 (7th Cir. 1988).  In any event, Wheeler has not properly preserved the Rule 403 claim by raising it only in passing and merely restating the language of the rule.  Throw-away assertions of this type, devoid of legal or factual development, are forfeited.  See Barna, 877 F.3d at 145.

X.

For the foregoing reasons, we will affirm.